Argued October 13, 14, 1885.—Decided January 4, 1886.

## STONE & Others v. FARMERS' LOAN & TRUST COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF MISSISSIPPI.

The right of a State to reasonably limit the amount of charges by a railroad company for the transportation of persons and property within its jurisdiction, cannot be granted away by its legislature unless by words of positive grant, or words equivalent in law.

A statute which grants to a railroad company the right "from time to time to fix, regulate and receive, the tolls and charges by them to be received for transportation," does not deprive the State of its power, within the limits of its general authority, as controlled by the Constitution of the United States, to act upon the reasonableness of the tolls and charges so fixed and regulated.

An act of incorporation, which confers upon the directors of a railroad company the power to make by-laws, rules and regulations touching the disposition and management of the company's property and all matters appertaining to its concerns, confers no right which is violated by the creation of a State Railroad Commission, charged with the general duty of preventing the exaction of unreasonable or discriminating rates upon transportation done within the limits of the State, and with the enforcement of reasonable police regulations for the comfort, convenience and safety of travellers and persons doing business with the company within the State.

A railroad forming a continuous line in two or more States, and owned and managed by a corporation whose corporate powers are derived from the legislature of each State in which the road is situated, is, as to the domestic traffic in each State, a corporation of that State, subject to State laws not in conflict with the Constitution of the United States.

This court agrees with the Supreme Court of Mississippi, that a statute creating a commission, and charging it with the duty of supervising railroads, is not in conflict with the Constitution of that State.

The provisions of the statute of Mississippi of March 11, 1884, creating a railroad commission, are not so inconsistent and uncertain as to necessarily render the entire act void on its face.

This was a suit brought by the Farmers' Loan and Trust Company, a New York corporation, to enjoin the Railroad

Commission of Mississippi from enforcing against the Mobile and Ohio Railroad Company the provisions of the statute of Mississippi passed March 11, 1884, entitled "An Act to provide for the regulation of freight and passenger rates on railroads in this State, and to create a commission to supervise the same, and for other purposes." That act was as follows:

"SECTION 1. Be it enacted by the Legislature of the State of Mississippi, That the track of every railroad in this State is a public highway, over which all persons have equal rights of transportation for passengers and freights on the payment of just compensation to the owner of the railroad for such transportation; and any person or corporation engaged in transporting passengers or freights over any railroad in this State, who shall exact, receive, or demand more than the rate specified in any bill of lading issued by such person or corporation, or who, for his or its advantage, or for the advantage of any connecting line, or for any person or locality, shall make any discrimination in transportation against any individual, locality, or corporation, shall be guilty of extortion."

Sections 2 and 3 related to the punishment of those so guilty and their liability in double damages to parties injured.

Sections 4 and 5 provided for the appointment of three commissioners, to be known as the Railroad Commission of the State of Mississippi, prescribed their qualifications and tenure of office, fixed their salaries, and subjected them to penalties and punishment for violation of duty.

Section 6 was as follows:

"SEC. 6. Be it further enacted, That it shall be the duty of all persons or corporations who shall own or operate a railroad in this State, within thirty days after the passage of this act, to furnish the commission with its tariff of charges for transportation of every kind; and it shall be the duty of said commission to revise said tariff of charges so furnished, and determine whether or not, and in what particular, if any, said charges are more than just compensation for the services to be rendered, and whether or not unjust discrimination is made in such tariff of charges against any person, locality, or corporation, and when said charges are corrected, as approved by said

commission, the commission shall then append a certificate of its approval to said tariff of charges; but in revising or establishing any and every tariff of charges it shall be the duty of said commission to take into consideration the character and nature of the services to be performed and the entire business of such railroad, together with its earnings from the passenger and other traffic, and so revise such tariffs as to allow a fair and just return on the value of such railroad, its appurtenances, and equipments; and it shall be the duty of said commission to exercise a watchful and careful supervision over every such tariff of charges, and continue such tariff of charges from time to time as justice to the public and each of said railroad companies may require, and to increase or reduce any of said rates according as experience and business operations may show to be just; and said commission shall accordingly fix tariffs of charges for those railroads failing to furnish tariffs as above required. And it shall be the duty of said railroad companies or persons operating any railroad in this State to post at each of its depots all rates, schedules, and tariffs for the transportation of passengers and freights, made or approved by said railroad commission, with said certificate of approval, within ten days after said approval, in some conspicuous place at such depot; and it shall be unlawful for any such person or corporation to make any rebate or reduction from such tariff in favor of any person, locality, or corporation which shall not be made in favor of all other persons, localities, or corporations by a change in such published rates, except as may be allowed by the commission; and when any change is contemplated to be made in the schedule of passenger or freight rates of any railroad by the commission, said commission shall give the person or corporation operating or managing said railroad notice in writing at least ten days before such change of the time and place at which such change will be considered."

Section 7 made it unlawful for a company to grant reductions or rebates prohibited by the act, and fixed a penalty for so doing.

Section 8 allowed reduced rates for certain kinds of transportation.

Section 9 was as follows:

"SEC. 9. Be it further enacted, That it shall be the duty of said commission to hear all complaints made by any person against any such tariff of rates so approved, on the ground that the same in any respect is for more than just compensation, or that such charges, or any of them, amount to or operate so as to effect unjust discrimination; such complaint must be in writing, and specify the items in the tariff against which complaint is made; and if it appears to the commission that there may be justice in the complaint, or that the matter ought to be investigated, the commission shall forthwith furnish to the person or corporation operating the railroad a copy of the complaint, together with notice, which said notice shall be served as other legal process is now required by law to be served on railroad companies, that at a time and place stated in the notice the tariff as to said items will be revised by the commission, and at such time and place it shall be the duty of the commission to hear the parties to the controversy in person or by counsel, or both, and such evidence as may be offered, oral or in writing, and may examine witnesses on oath, conforming to the mode of proceedings, as nearly as may be convenient, to that required of arbitrators, giving such time and latitude to each side and regulating the opening and conclusion of any argument as the commission may consider best adapted to arrive at the truth; and when the hearing is concluded the commission shall give notice of any change deemed proper by them to be made to the person or corporation operating the railroad: *Provided*, In no instance shall any corporation, railroad, or person be criminally or civilly liable for the making of any charge or discrimination whatever, if the same is not in violation of the tariff of charges or rules and regulations prescribed by the commission."

Sections 10 and 11 were unimportant in this case.

The remainder of the statute was as follows:

"SEC. 12. Be it further enacted, That every person or corporation operating a railroad in the State shall furnish the said commission with all the information required relative to the management of their respective lines, and particularly with

copies of all leases, contracts, and agreements for transportation with express, sleeping-car, or other companies to which they are parties.

"Sec. 13. Be it further enacted, That every railroad company shall, within twenty-four hours after the occurrence of any accident to a train, attended with serious personal injury, on any portion of its line within the limits of this State, give notice of the same to the railroad commissioners, who, upon information of such accident, may repair or dispatch one or more of their number to the scene of said accident and inquire into the facts and circumstances thereof, which shall be recorded in the minutes of their proceedings, and embraced in their annual report.

"Sec. 14. Be it further enacted, That the commission shall make annual reports to the governor on or before the first day of January in each year, for transmission to the legislature, of their doings for the year ending on the 30th day of September next preceding, containing such facts as will disclose the actual working of the railway system in this State, and such suggestions as to the general railroad policy of the State as may seem to them appropriate.

"Sec. 15. Be it further enacted, That it shall be the duty of every railroad company or person operating a railroad in this State to make quarterly returns of the business of said railroad to the railroad commission of Mississippi, which returns shall embrace all the receipts and expenditures of said railroad, and to be made according to forms furnished by the said railroad commissioners for that purpose.

"Sec. 16. Be it further enacted, That the quarterly returns herein provided shall be made as aforesaid within thirty days after the end of each quarter to which they relate, and any railroad company, or persons operating any railroad in this State, which shall fail or refuse to make the quarterly returns, as provided for in this act, shall forfeit to the State of Mississippi fifty dollars for every day of such refusal or neglect.

"Sec. 17. Be it further enacted, That the said quarterly returns shall be sworn to by one or more officers of said company, or of the persons operating the said railroad, who has

knowledge of their truth, and any person knowingly swearing falsely to any statement in any of said quarterly reports shall be guilty of perjury.

"SEC. 18. Be it further enacted, That it shall be the duty of the commissioners to inspect the depots of the railroads operated in this State, and see that at least one comfortable and suitable reception-room is provided at each depot for the use and accommodation of persons desiring and awaiting transportation over their line, and any railroad company failing or refusing to provide such room, after sixty days' notice from the commissioners to provide the same, shall be liable to a penalty of not less than fifty dollars for each day they so fail or refuse to provide such room, and said railroad company shall keep at all times in such reception rooms a bulletin board, which shall show the time of the arrival and departure of trains, and when any passenger train or other train for transporting passengers is delayed, notice of same shall be made on said bulletin board for the information of passengers, stating as nearly as can be ascertained the extent of the delay and probable time of arrival.

"SEC. 19. Be it further enacted, That the determination of every matter of said commission shall be in writing, and proof thereof shall be made by a copy of the same, duly certified to by the clerk of said commission; and whenever any matter has been determined by said commission, in the course of any proceeding before it relating to the regulation or supervision of any railroad in this State, and coming within the jurisdiction of such commission, proof of the fact of such determination, duly certified as aforesaid, shall be received in all the courts of this State, or before any officers thereof, in all civil cases, as *prima facie* evidence that such determination was right and proper, and the record of the proceedings of said commission shall be deemed a public record, and shall at all reasonable times be subject to the inspection of the public.

"SEC. 20. Be it further enacted, That said commission, or any one of said commissioners, may, in the discharge of any of the duties imposed upon them by this act, administer oaths, take affidavits, and summon and examine witnesses under oath, in all matters coming before them, and if any person shall tes-

tify, or make any false affidavit or oath, before said commission, or before any of said commissioners, or before any officers, to any matter coming before said commission, he shall be deemed guilty of perjury, and, upon conviction thereof, shall be punished according to law.

" Sec. 21. Be it further enacted, That all summons for witnesses to appear before said commission, or before any one or more of said commissioners, and notice to persons or corporations, shall be issued by one of said commissioners, and be directed to any sheriff, constable, or marshal, of any city or town, who shall execute the same in his bailiwick, and make due return thereof as directed therein, under the penalties prescribed by law for a failure to execute and return the process of any court; and if any person, duly summoned to appear and testify before said commission, or before any one or more of said commissioners, shall fail or refuse to appear and testify without a lawful excuse, or shall refuse to answer any proper question propounded to him by said commission, or any of said commissioners, or if any person shall obstruct said commission, or one or more of said commissioners, in the discharge of duty, or shall conduct himself in a rude, disrespectful, or disorderly manner before said commission, or any of them deliberating in the discharge of duty, such person shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than fifty nor more than one thousand dollars.

" Sec. 22. Be it further enacted, That witnesses summoned to appear before said commission shall be entitled to the same per diem and mileage as witnesses attending Circuit Court; and witnesses summoned by said commission on its behalf shall be paid out of the State treasury on warrants, to be drawn by the auditor upon the certificate of the commission, showing the amount and items thereof, to which such witness may be entitled; and witnesses summoned for any railroad shall be paid by such railroad.

" Sec. 23. Be it further enacted, That if any railroad company, or person, or corporation operating any railroad in this State, shall violate any of the provisions of this act, or the tariff of charges, as fixed by such commission, such company,

person, or corporation, shall be liable to a penalty of five hundred dollars for each violation not otherwise provided for; and such penalty may be recovered by an action to be brought in the name of the State of Mississippi in any county where such violation may occur, or injury or wrong be done. The commission shall institute such action through the district attorney of the proper district, and no such suit shall be dismissed without the consent of the court and of said commission; and if any district attorney shall neglect for thirty days, after notice to bring any such suit, the commission may direct some attorney-at-law to bring the same, and his fee therefor shall be fixed by the court, and shall not exceed fifty per cent. of the amount collected; and the district attorney shall not interfere in such suit, and the same shall not be dismissed without consent as aforesaid: *Provided,* That in all trials of cases brought for a violation of any tariff of charges, as fixed by the commission, it may be shewn in defence that such tariff so fixed was unjust.

" SEC. 24. Be it further enacted, That the remedies hereby given shall be regarded as cumulative to the remedies now given by law against railroad corporations, and this act shall not be construed as repealing any statute giving such remedies.

" SEC. 25. Be it further enacted, That the provisions of this act shall apply to and include all persons, firms, and companies, and to all associations of persons, whether incorporated or otherwise, that shall operate a railroad in this State (street railways excepted).

" SEC. 26. Be it further enacted, That hereafter the election of railroad commissioners shall be at such time, in such manner, and for such term as may be determined by the legislature.

" SEC. 27. Be it further enacted, That the schedules adopted by the commission for charges for transportation of persons and freight shall not be enforced against any railroad in this State before the first day of May, A.D. 1884.

" SEC. 28. Be it further enacted, That this act shall take effect and be in force from and after its passage."

On the 15th of March, 1884, the following supplemental act was passed:

" SEC. 1. Be it enacted by the Legislature of the State of Mississippi, That the act entitled ' An act to provide for the regulation of freight and passenger rates on railroads in this State, and to create a commission to supervise the same, and for other purposes,' approved March 11, 1884, shall not be so construed as to authorize said commissioners to require bulletin boards to denote the delay of trains noted thereon, or to. require the erection of station-houses in any case where in their judgment the public travel does not make it necessary, nor shall said act be so construed as to require said commission to investigate or call upon any railroad company for rates of charges in transportation or travel from any point outside of this State to points outside of this State, or in any way interfere with such rates of charges."

On the third of February, 1848, the legislature of Alabama passed an act to incorporate the Mobile and Ohio Railroad Company, with power " to locate, construct, and finally complete a single, double, or treble railroad or way from some suitable point in the city of Mobile, in a westerly or northwesterly direction, to the west line of this State, towards the mouth of the Ohio River, on such route as shall be deemed most expedient; and to transport, take, and carry property and persons upon said railroad or way by the power and force of steam, of animals, or of any other mechanical or other power, or any combination of them which said company may choose to apply ; " and " with permission to make any lawful contract with any other railroad corporation in relation to the business of said company, and also to make joint stock with any other railroad corporation."

The immediate government and direction of the affairs of the company were vested in a board of directors to be chosen by the stockholders, and by § 7 it was provided : " That the directors shall have full power to make and prescribe such by-laws, rules, and regulations as they shall deem needful and proper, touching the disposition and management of the stock, property, estate, and effects of said company, not contrary to this charter or the laws of this State or of the United States ; the transfer of shares, the duties and conduct of their officers

and servants, touching the election of and meeting of the directors; and all matters whatsoever which may appertain to the concerns of said company."

Section 12 was as follows:

"SEC. 12. And be it further enacted, That it shall be lawful for the company hereby incorporated from time to time to fix, regulate, and receive the toll and charges by them to be received for transportation of persons or property on their railroad, or way aforesaid, hereby authorized to be constructed, erected, built, or used, or upon any part thereof."

On the 17th of February, 1848, the legislature of Mississippi passed "An Act to incorporate the Mobile and Ohio Railroad Company." This act, after reciting the incorporation of the company in Alabama, and setting out that act of incorporation in full, "the same as printed in Alabama," and also reciting that Mississippi was "desirous to aid in accomplishing the object of the said act," proceeded as follows:

"SEC. 1. Be it enacted by the Legislature of the State of Mississippi, That the railroad described in the above-recited act be extended in the State of Mississippi, from the Alabama line to the State of Tennessee, in such direction and on such a route as shall be deemed most expedient; and that as to said extension there is granted to the said Mobile and Ohio Railroad Company, when organized, the same rights, powers, and privileges as are granted to it within the State of Alabama by the same act, subject, however, to the same and similar conditions, restrictions, modifications, and provisions as are in said act above recited, contained, and set forth, excepting the provision contained in section 15 of said act; and the said act is hereby concurred in and adopted within the State of Mississippi in reference to the said railroad as extended, and in reference to the said Mobile and Ohio Railroad Company, with the exception of that portion contained in section 15, as before stated: *Provided*, That in case of persons absent or unknown, whose lands may be condemned pursuant to sections 7, 8, and 9 of said recited act, the placing of the amount of the damages assessed to the credit of the owner, in the hands of the State treasurer, shall be taken as payment; and on such owner ap-

pearing or tendering satisfactory evidence of his claims thereto, such damages shall be paid him by the treasurer on the warrant of the auditor of public accounts."

The excepted section related to taxation, and as to this a different provision was made in Mississippi from that in the Alabama charter. Power was also given the company to cross the tracks of other railroads in Mississippi, and some slight changes were made in the provision for depositing the amount of damages assessed upon the condemnation of property for the use of the company. Otherwise the charters of the company in these two States were substantially identical.

On the same day, February 28, 1848, the legislature of Tennessee passed " An Act to incorporate the Mobile and Ohio Railroad Company and the Tennessee Central Raiload Company." This act began as follows :

" Whereas it appears to this general assembly, from the memorial of Jonathan Emanuel, president, and George N. Stewart, Sidney Smith, Moses Waring, Charles Le Baron, and S. Griffith Fisher, directors of the Mobile and Ohio Railroad Association, that a company has been organized at Mobile, in the State of Alabama, for the purpose of constructing a railroad from Mobile to the Tennessee River, and from thence to a suitable point near the mouth of the Ohio River, for which purpose said board of president and directors have applied to this general assembly for the passage of such a law as may be necessary to authorize the construction of said road through the State of Tennessee :

· " And whereas it is deemed a matter of vital importance to this State that a direct communication by railroad to the Gulf of Mexico be established : Therefore,

" SEC. 1. Be it enacted by the General Assembly of the State of Tennessee, That the said Jonathan Emanuel, president, and the said George N. Stewart, Sidney Smith, Moses Waring, Charles Le Baron, and S. Griffith Fisher, directors, and their associates, who shall be the stockholders of said company, and their successors, under the name and style of ' The Mobile and Ohio Railroad Company,' are hereby declared to be a body corporate and politic under the laws of Tennessee,

with succession for five hundred years, and a common seal, with capacity to have, receive, and enjoy, to them and their successors, property and estate of whatsoever nature and quality, and the same to alienate, transfer, and dispose of, so far as may be necessary to carry into effect the main object of this charter, which is hereby declared to be the construction, use, and maintenance of a railroad from Mobile, in the State of Alabama, to some point on the Mississippi or Ohio River, near the mouth of the Ohio, passing through the State of Tennessee."

The remainder of the act related to the powers and privileges of the company in Tennessee.

On the 26th of February, 1848, the General Assembly of Kentucky passed an act "to authorize the Mobile and Ohio Railroad Company to extend their railroad from the south boundary line of the State of Kentucky to the Mississippi or Ohio Rivers," as follows:

"SEC. 1. Be it enacted by the General Assembly of the Commonwealth of Kentucky, That the Mobile and Ohio Railroad Company, when formed under the act of the General Assembly of the State of Alabama, approved February 3, 1848, entitled 'An Act to incorporate the Mobile and Ohio Railroad Company,' shall be allowed the privilege of making any necessary reconnoissance and survey for the purpose of ascertaining the most eligible route for extending the Mobile and Ohio Railroad to any point upon the Mississippi or Ohio Rivers in this State.

"SEC. 2. Be it further enacted, That as soon as said route and point shall be ascertained the said Mobile and Ohio Railroad Company shall be allowed the right of way for the extension and construction of their said railroad from the Tennessee line to the Mississippi or Ohio Rivers, and that they shall be entitled to all the privileges, rights, and immunities, and subject to all such restrictions, as are granted, made, and prescribed for the benefit, government, and direction of said Mobile and Ohio Railroad Company within the State of Alabama by the act above described."

On the 20th of September, 1850, Congress passed "An Act

granting the right of way and making a grant of land to the States of Illinois, Mississippi, and Alabama in aid of the construction of a railroad from Chicago to Mobile."

This act provided "that the said railroad and branches shall be and remain a public highway for the use of the government of the United States free from toll or other charges," and "that the United States mail shall at all times be transported on the said railroad, under the direction of the Post Office Department, at such price as the Congress may by law direct."

These lands were transferred by Alabama and Mississippi to the Mobile and Ohio Railroad Company in 1850 and 1851, and in 1859 Congress ratified and confirmed the grants and extended the time for building the road.

The case was heard on demurrer to the bill. The Circuit Court rendered a decree allowing the injunction, and from that decree this appeal was taken.

*Mr. John W. C. Watson* for appellants.

*Mr. John A. Campbell* and *Mr. E. L. Russell* for appellee.— The railroad of the Mobile & Ohio Railroad Co. was completed in 1848 conformably to charters granted by Alabama, Mississippi, Tennessee, and Kentucky. Among the franchises granted to it was the power to fix, regulate, and collect tolls and charges for the transportation of persons and property on its road. The grant of this franchise vested it as a legal right, not subject to legislative repeal or regulation. *London* v. *Hierons*, 2 Moore P. C. 102, 113; *Gard* v. *Callord*, 6 M. & S. 70; *Attorney General* v. *Railroad Co.*, 35 Wisc. 586; 1 Savigny des Obligations, 427; *Stamford* v. *Salisbury*, 1 Cromp. & Jerv. 400; *Jenkyns* v. *Harney*, 5 Tyrwh. 871. The inability of Mississippi to impair contracts or obligations by legislative enactment or judicial decision, and its inability to diminish privileges contained in charters granted by it have already been declared by this court. *Planters' Bank* v. *Sharp*, 6 How. 301; *Bacon* v. *Robertson*, 18 How. 480; *Groves* v. *Slaughter*, 15 Pet. 449. See also *Dodge* v. *Woolsey*, 18 How. 341, 347. The nature of the legislative contract made with the corporation is described

by the Supreme Court of Massachusetts in *Commissioners* v. *Farmers' Bank*, 21 Pick. 542. Shaw, C. J., says: "It is clearly a stipulation on the part of the government that the corporation shall be and continue a corporation for an indefinite time, or for a time limited by the act unless sooner forfeited for some cause recognized by existing laws as a cause for forfeiture: that their constitution, organization, and mode of action, as prescribed by the charter, shall not be annulled or changed by the legislature; that members shall not be added or removed; that modes of election, expulsion or suspension of members shall not be altered; and that whatever belongs to their organic constitution and action as bodies politic shall continue and be determined by the terms of the charter. In addition to which the powers specially granted to them are not to be withdrawn or diminished."

The statute passed by the legislature changes fundamentally the mode prescribed by the charter for fixing rates of transportation. The extract from Chief Justice Shaw shows clearly that this is an offence against the Constitution. See also *Chicago, Burlington & Quincy Railroad Co.* v. *Chicago*, 94 U. S. 155; *Railroad Co.* v. *Maryland*, 21 Wall. 456, 470; *Mobile & Ohio Railroad Co.* v. *Moseley*, 52 Mississippi, 127; *Sloan* v. *Pacific Railroad Co.*, 61 Missouri, 22; *Perrine* v. *Chesapeake & Delaware Canal Co.*, 9 How. 172, 184; *Maryland* v. *Baltimore & Ohio Railroad Co.*, 3 How. 534; *Olcott* v. *Supervisors*, 16 Wall. 678, 694; *Wilmington Railroad* v. *Reid*, 13 Wall. 264.

If it be said that the charter conferred upon the company only a permissory and revocable license, we reply that the charter was given as determining the conditions of a contract for long and continuous service of public utility, and that the power to fix and collect rates was essential to its performance. The grant to do so was a commission to the company, for a valuable consideration, to fix, regulate, and collect the tolls and charges. The existence of the company, its mode of organization and proceeding, and its franchises and modes of exercising them, all spring from this legislative act. It describes an agreement on the part of the company to construct

the road within the time designated, sufficient for the transportation of persons and property. To enable it to perform this, the power to lay tolls and collect charges was indispensable, and inevitably followed. The twelfth section specifies distinctly, what would have been inferred from the incorporation of the company, the disclosure of the objects and purposes of the act, and the concession of all of the powers, privileges, and immunities necessary and which shall become thereafter necessary for the purpose.

The adoption of this charter resulted from the concurrent act of four States of this Union. The object of the act and purposes to be accomplished by it were common to those States, and the instrument for them was selected and commissioned by all. The statute of Mississippi is designed to alter, and to disturb and derange the plan adopted by the four States for the administration of the affairs of the company, and to enable Mississippi to dictate the mode of operation of the company. The result of the co-operative adoption of the company in these four States, with the same powers of administration for transportation through each and all of the States, is to establish a community of right and interest which neither of them can separately and partially derange or transform. *Brocket* v. *O. & P. Railroad Co.*, 14 Penn. St. 244; *Cleveland R. Co.* v. *Speer*, 56 Penn. St. 325; *County* v. *Railroad Co.*, 51 Penn. St. 228; *P. & W. R. Co.* v. *Maryland*, 10 How. 376; *Sprague* v. *Hartford*, 5 R. I. 233; *The State* v. *Railroad Co.*, 18 Maryland, 193; *Merrick* v. *Van Santvoord*, 34 N. Y. 213; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Brown* v. *Houston*, 114 U. S. 622.

The franchises thus conferred upon the company were property, and as such protected by the Constitution of the United States against legislative spoliation. The constitutions of all the States in which the franchises are to be executed also recognize the principle of property, and the existence of the right of private ownership, and that this principle and right are not to be invaded by the State legislature. It is notorious that organizations exist to subvert this ancient and stable principle. The legislature of Mississippi by its legislation lends itself to

these attacks upon the social structure. The manifest intent of the statute is to obtain control over railroad transportation through the power of fixing rates.

In the new schemes for readjusting the relations of society, the importance of railroads is acknowledged by socialist writers, and their appropriation provided for. Not only land but all instruments of production are to be made the collective property of all, to be worked by associated labor, for the common benefit. This can never be attained. Individual effort is necessary for the creation of property. The right of free competition to buy, to sell, to dispose of property, is essential to our civilization and habits of social life. The law imposes few limits on it except those required for the protection of good morals. Out of this freedom spring contracts and the security afforded to property and personal liberty. We may conceive of a state of society where it may be proper to endow a government with power to dispose of persons and property at its will. But no such state of society exists in the United States.

We object to this legislation, because of the violation of a contract made by the State, in changing the conditions of a charter conferred by herself to secure the employment of capital and industry in the completion of a work which the State had decided to be of public utility. Also because of a want of power of the State to alter a contract where other parties jointly concerned were interested and concerned, and because of the invasion of rights of property. The documentary evidence of title shown by this company, and the confessions of the demurrer show a possession for twenty-five years of property in land, erections and buildings on the land, and employment of both, with incontestable authority to do the work the company was appointed to do in the manner in which it has been done.

The statute of Mississippi affirms an authority to direct the company in the matter of its tolls and charges, and to fix and to regulate them in respect to every item and detail of its business, and prescribes not only that the items of charge shall be determined, but also that the value of the property as assessed or determined by the commissioners shall be the basis on which

the apportionment of the freights and fares shall be estimated: all of which violates the contract between the company and the State, and deprives the company of a property which it has earned by constructing the road.

We further contend that the Mississippi act is void for want of sufficient certainty. [Counsel analyzed the act in order to show that such would be the result.]

And it is further insisted that this act is in direct conflict with, and violates the Constitution of Mississippi.

Article 1, section 12, of the Constitution of the State of Mississippi, provides, that "the right of trial by jury shall remain inviolate," article 3, sections 1 and 2, of that Constitution provides: "That the powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit: those which are legislative, to one; those which are judicial, to another; and those which are executive, to another." " No person or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except in instances hereinafter expressly directed or permitted." And section 2 of article 1, which provides that "No person shall be deprived of life, liberty or property, without due process of law."

The provision of section 19 of the act, which says, that the determination of the commission "shall be received by all the courts of this State as *prima facie* evidence in any suit brought under the authority of the act," is a direct violation of this Constitution.

*Mr. P. Hamilton* also filed a brief for appellee, further contending that inasmuch as the road was one continuous property running through four States, it was a highway for commerce within the jurisdiction of Congress; and inasmuch as the act of Mississippi assumed to regulate the rates upon commerce external to the State and passing through it, as well as upon domestic commerce within the State, it infringed that clause of the Constitution which confers upon Congress the power to regulate commerce among the several States: citing *Pensacola*

*Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1; *The Clinton Bridge*, 1 Woolworth, 150; *Miller* v. *New York*, 109 U. S. 385; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Pennsylvania* v. *Wheeling Bridge Co.*, 18 How. 421, 430; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; *Mobile* v. *Kimball*, 102 U. S. 691; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Railroad Co.* v. *Husen*, 95 U. S. 465, 470; *State Freight Tax Cases*, 15 Wall. 232; *Brown* v. *Maryland*, 12 Wheat. 419, 448; *Cooley* v. *Wardens of Philadelphia*, 12 How. 299; *Walton* v. *Missouri*, 91 U. S. 275; *Keiser* v. *Illinois Central Railroad Co.*, 18 Fed. Rep. 151; *Pacific Steamship Co.* v. *Railroad Commissioners*, 18 Fed. Rep. 10; *Sinnot* v. *Davenport*, 227, 242; *Peik* v. *Chicago & Northwestern Railway Co.*, 94 U. S. 164, 177; *Head Money Cases*, 112 U. S. 580; *Cardwell* v. *American Bridge Co.*, 113 U. S. 205.

Mr. Chief Justice Waite delivered the opinion of the court. After stating the facts in the language above reported, he continued:

The argument in support of the decree below is:

1. That the statute under which the commissioners are to act impairs the obligation of the charter contract of the Mobile and Ohio Railroad Company;

2. That it is, so far as that company is concerned, a regulation of commerce among the States;

3. That it denies the company the equal protection of the laws; and deprives it of its property without due process of law;

4. That it confers both legislative and judicial powers on the commission, and is thus repugnant to the Constitution of Mississippi; and

5. That it is void on its face by reason of its inconsistencies and uncertainties.

These several positions will be considered in their order.

1. The provisions of the charter on which the claim of contract rests are found in §§ 1, 7, and 12, as follows:

"Sec. 1. And the said company is hereby authorized and empowered . . . to transport, take, and carry property

RAILROAD COMMISSION CASES. 325

Opinion of the Court in Stone *v.* Farmers' Loan & Trust Co.

and persons upon said railroad or way by the power and force of steam, of animals, or of any other mechanical or other power, or any combination of them which the company may choose to apply."

" SEC. 7. That the directors shall have full power to make and prescribe such by-laws, rules, and regulations as they shall deem needful and proper touching the disposition and management of the stock, property, estate, and effects of said company, not contrary to this charter or the laws of this State or of the United States; the transfer of shares, the duties and conduct of their officers and servants, touching the election of, and meeting of the directors; and all matters whatsoever which may appertain to the concerns of said company."

" SEC. 12. That it shall be lawful for the company hereby incorporated from time to time to fix, regulate, and receive the toll and charges by them to be received for transportation of persons or property on their railroad, or way aforesaid, hereby authorized to be constructed, erected, built, or used, or upon any part thereof."

From this it is claimed that the State granted to the company, for the full term of its corporate existence, that is to say, forever, the right of managing its own affairs and regulating its charges for the transportation of persons and property, free of all legislative control.

It is now settled in this court that a State has power to limit the amount of charges by railroad companies for the transportation of persons and property within its own jurisdiction, unless restrained by some contract in the charter, or unless what is done amounts to a reg l; ;ion of foreign or inter-state commerce. *Railroad Co.* v. *Maryland*, 21 Wall. 456 ; *Chicago, Burlington & Quincy Railroad Co.* v. *Iowa*, 94 U. S. 155.; *Peik* v. *Chicago and Northwestern Railway Co.*, 94 U. S. 164; *Winona and St. Peter Railroad Co.* v. *Blake*, 94 U. S. 180; *Ruggles* v. *Illinois*, 108 U. S. 526, 531. This power of regulation is a power of government, continuing in its nature, and if it can be bargained away at all it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt, it must be resolved in favor of the

existence of the power. In the words of Chief Justice Marshall, in *Providence Bank* v. *Billings*, 4 Pet. 514, 561, "its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear." This rule is elementary, and the cases in our reports where it has been considered and applied are numerous. Thus, in *Providence Bank* v. *Billings*, it was held that the incorporation of a bank without any special provision for taxation did not imply a contract on the part of a State not to tax at all. In *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 419, 548, the court said this rule of construction was not confined to the taxing power, and accordingly it held that the charter of a toll-bridge company did not imply a contract not to allow the building of another bridge in the immediate vicinity which would materially interfere with its revenues. In delivering the opinion of the court, Chief Justice Taney used this language: "This act of incorporation is in the usual form, and the privileges such as are commonly given to corporations of that kind. It confers on them the ordinary faculties of a corporation for the purpose of building the bridge; and establishes certain rates of toll which the company are authorized to take; that is the whole grant. There is no exclusive privilege given to them over the waters of Charles River above or below their bridge; no right to erect another bridge themselves nor to prevent other persons from erecting one; no engagement from the State that another shall not be erected; and no undertaking not to sanction competition, nor to make improvements that may diminish the amount of its income." In *Minot* v. *Philadelphia, Wilmington & Baltimore Railroad Co.*, known as the *Delaware Railroad Tax Case*, 18 Wall. 206, 226, it was held that a provision in the charter that the railroad company "should pay annually into the treasury of the State a tax of one-quarter of one per cent. on its capital stock of four hundred thousand dollars," without any words "indicating the intent of the legislature that no further or different tax should be subsequently levied," was not sufficient to show a contract binding the State not to make such a levy, the court remarking that "the surrender, when claimed, must be shown by clear, unam-

biguous language, which will admit of no reasonable construction consistent with the reservation of the power." So, in *Bailey* v. *Magwire*, 22 Wall. 215, 228, it was held that a clause in a charter which subjected a corporation "to taxation at the rate assessed by the State on other real or personal property of like value," did not relieve the company from taxation for other than State purposes. And here the court said: "Silence on such a subject," that is to say, taxation for other purposes, "cannot be construed as a waiver of the right of the State in this regard. There must be something said which is broad enough to show clearly that the legislature intended to relieve the corporation from a part of the burdens borne by other real and personal property." In *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, it appeared that a company had been incorporated with authority to establish and maintain, for fifty years, "chemical and other works at the place designated . . . for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer, or into other chemical products, by means of chemical or other processes;" but this court held that the State was not thereby prevented from causing the works to be abated in case they should, within the time of the charter, become a public nuisance because of the growth of population in the neighborhood, and among the reasons assigned was the absence from the charter of any express exemption of the company from the operation of the powers of the State applicable to its existing condition for the time being. In *Newton* v. *Commissioners*, 100 U. S. 548, 562, the seat of justice of a county had been fixed at Canfield, but the statute by which this was done provided "that before the seat of justice shall be considered permanently established at Canfield," the citizens should donate a lot and make certain provisions for the erection of public buildings thereon. The citizens complied with all the requirements of the law, and the seat of justice remained undisturbed at the place where it had been "permanently established" until 1874, when a law was passed for its removal to another town. The citizens of Canfield then caused a bill to be filed for an injunction restraining the county commissioners from effecting the

removal, on the ground that the original act, and what was done under it, constituted an executed contract on the part of the State that the seat of justice should remain forever at Canfield, and the later act impaired the obligation of that contract; but this court held otherwise, saying, among other things, "If the legislature had intended to assume an obligation that it should be *kept there* in perpetuity, it is to be presumed it would have said so. We cannot—certainly not in this case —interpolate into the statute a thing so important which it does not contain."

The cases in which it has been held that a contract was entered into are equally instructive. Thus in *Gordon* v. *The Appeal Tax Court*, 3 How. 133, the statute was: "That upon any of the banks in this State complying with the conditions of this act, the faith of the State is hereby pledged not to impose any future tax or bonus on the said banks during the continuance of their charters under this act." In *State Bank of Ohio* v. *Knoop*, 16 How. 369, the provision was that each bank organized under the act should semi-annually, on the days designated for declaring dividends, set off to the State six per cent. on the profits deducting therefrom the expenses and ascertained losses for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject, and from the judgment that this was a contract of exemption from any further exercise of the power of taxation three justices dissented. In *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, the words of exclusion were, "that it should not be lawful for any person or persons whatsoever to erect, or cause to be erected [within certain specified limits], any other bridge or bridges over or across the said river." In *Home of the Friendless* v. *Rouse*, 8 Wall. 430, the provision was that all property of said corporation shall be exempt from taxation, and that a certain existing statute to the effect that every act of incorporation should be subject to alteration and repeal "shall not apply to this corporation."

Such being the rule, and such its practical operation, we return to the special provisions of the charter on which this case

depends, and find, first, the authority given the corporation to carry persons and property. This of itself implies authority to charge a reasonable sum for the carriage. In this way the corporation was put in the same position a natural person would occupy if engaged in the same or like business. Its rights and its privileges in its business of transportation are just what those of a natural person would be under like circumstances; no more, no less. The natural person would be subject to legislative control as to the amount of his charges. So must the corporation be. That was decided in *Railroad Co.* v. *Maryland; Chicago, Burlington & Quincy Railroad Co.* v. *Iowa; Peik* v. *Chicago & Northwestern Railway Co.; Winona & St. Peter Railroad Co.* v. *Blake;* and *Ruggles* v. *Illinois;* all cited above.

Next follows the power of the directors to make by-laws, rules, and regulations for the management of the affairs of the company, but it is expressly provided that such by-laws, rules, and regulations shall not be contrary to the laws of the State. This we held in *Ruggles* v. *Illinois* included laws in force when the charter was granted, and those which came into operation afterwards as well. It is true that the clause which thus limits the power of the directors is found in the middle of the sentence which confers the power, but it clearly was intended to refer to everything that might be done in this way " touching . . . all matters whatsoever that may appertain to the concerns of said company." There is nothing here, therefore, which in any manner implies a contract on the part of the State to exempt the company from the operation of laws enacted within the scope of legislative power for the regulation of the business in which it is authorized to engage.

The case turns consequently on § 12, which is, " that it shall be lawful for the company . . . from time to time to fix, regulate, and receive the toll and charges by them to be received for transportation," &c. This would have been implied from the rest of the charter if there had been no such provision, and it is argued that, unless it had been intended to surrender the power of control over fares and freights, this section would not have been inserted. The argument concedes that the power of

the company under this section is limited by the rule of the common law which requires all charges to be reasonable. In *Munn* v. *Illinois*, 94 U. S. 113, and *Chicago, Burlington & Quincy Railroad Co.* v. *Iowa*, above cited, this court decided that, as to natural persons and corporations subject to legislative control, the State could, in cases like this, fix a maximum beyond which any charge would be unreasonable, and that such maximum when fixed would be binding on the courts in their adjudications, as well as on the parties in their dealings. The claim now is that by § 12 the State has surrendered the power to fix a maximum for this company, and has declared that the courts shall be left to determine what is reasonable, free of all legislative control. We see no evidence of any such intention. Power is granted to fix reasonable charges, but what shall be deemed reasonable in law is nowhere indicated. There is no rate specified, nor any limit set. Nothing whatever is said of the way in which the question of reasonableness is to be settled. All that is left as it was. Consequently, all the power which the State had in the matter before the charter it retained afterwards. The power to charge being coupled with the condition that the charge shall be reasonable, the State is left free to act on the subject of reasonableness within the limits of its general authority as circumstances may require. The right to fix reasonable charges has been granted, but the power of declaring what shall be deemed reasonable has not been surrendered. If there had been an intention of surrendering this power, it would have been easy to say so. Not having said so, the conclusive presumption is there was no such intention.

This is not in conflict with the judgment of the Supreme Court of Mississippi in *Railroad Commission* v. *Yazoo & Mississippi Railroad Co.*, in which it was decided that the power had been surrendered in favor of that company because in that charter a maximum of rates was fixed. In the opinion, a copy of which has been furnished us in advance of its publication in the regular series of reports, the court says distinctly that " a grant in general terms of authority to fix rates is not a renunciation of the right of legislative control so as to secure reasonable rates. Such a grant evinces merely a purpose to confer

RAILROAD COMMISSION CASES.        331

Opinion of the Court in Stone *v.* Farmers' Loan & Trust Co.

power to exact compensation, which shall be just and reasonable. It is only where there is an unmistakable manifestation of a purpose to place the unrestricted right in the corporation to determine rates of compensation that the power of the legislature afterwards to interfere can be denied." In *Railroad Commission v. Natchez, Jackson & Columbia Railroad Co.* it was held by the same court that the charter authority for the company "from time to time to fix, regulate, and receive tolls and charges by them to be received for transportation of persons and property," did not amount to a contract of exemption, and the commission was allowed to proceed under the law.

From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law. What would have this effect we need not now say, because no tariff has yet been fixed by the commission, and the statute of Mississippi expressly provides "that in all trials of cases brought for a violation of any tariff of charges, as fixed by the commission, it may be shown in defence that such tariff so fixed is unjust."

It is also claimed that the charter contains a contract binding the State to allow the company, at all times and in all ways, to manage its own affairs through its own board of directors, and that the obligation of this contract will be impaired if the provisions of the statute are enforced by the commissioners. As has already been seen, the power of the directors is coupled with a condition that their management shall be in accordance with the laws of the State. This undoubtedly means with such laws as may be constitutionally enacted touching the administration of the affairs of the company. The present statute requires the company, 1, to furnish the commissioners with copies of its tariffs for all kinds of transportation; 2, to post in some conspicuous place at each of its depots the tariff approved by

the commissioners, with the certificate of approval attached; 3, to conform to the tariff as approved without discrimination in favor of or against persons or localities; 4, to furnish the commissioners with all the information they require relative to the management of its line, and particularly with copies of all leases, contracts, and agreements for transportation with express, sleeping-car, or other companies to which they are parties; 5, to report all accidents within the limits of the State attended with any serious personal injury; 6, to make quarterly returns of its business to the commissioners, which returns shall embrace all the receipts and expenditures of its railroad; 7, to provide at least one comfortable and suitable reception room at each depot for the use and accommodation of persons desiring or awaiting transportation over its road; and 8, to keep at all times in such reception rooms a bulletin board which shall show the time of the arrival and departure of trains, and when any passenger or other train transporting passengers is delayed, notice of the extent of the delay and the probable time of arrival as near as it can be ascertained.

The second and third of these requirements relate only to the duty of the company to keep its charges within the limit of the tariff approved by the commissioners without discrimination in favor of or against persons or localities. The first, fourth, and sixth are clearly intended as a means of furnishing the commissioners with the information necessary to enable them to act understandingly in fixing the tariff. Whether under these provisions the company can be required to make a report of or give information about its business outside of Mississippi is a question we do not now undertake to decide. The second, fifth, seventh, and eighth are nothing more than reasonable police regulations for the comfort, convenience, and safety of those travelling upon the road or doing business with the company in the State.

The commissioners have power, 1, to approve, and if need be to fix the tariff of charges for transportation, both of persons and property, by which the company must be governed, and to exercise a watchful and careful supervision over such tariff; 2, to notify the company of the times and places when and where

the propriety of a change in existing tariffs will be considered; 3, to entertain complaints made by any person against a tariff which has been approved, on the ground that the same is in any respect for more than a just compensation, or that the charges amount to or operate so as to effect unjust discrimination, and, after due notice to the company and proper inquiry had, to make any changes that may be deemed proper; 4, to repair to the scene of an accident within the State attended with serious personal injury, and inquire into the facts and circumstances thereof, to be recorded in the minutes of their proceedings and embraced in the annual report they are required to make to the governor for transmission to the legislature; 5, to inspect the depots of all railroads operated in the State and to see that comfortable and suitable reception rooms are provided; and 6, to institute all necessary suits for the recovery of the penalties prescribed by the statute for a violation of its provisions.    The first three of these relate entirely to proceedings for fixing charges and supervising the tariff, and the rest, like the correlative requirements of the company, are mere police regulations which the commissioners are to enforce.    All this comes clearly within the supervising power of the State in the administration of the affairs of its domestic corporations.

We conclude, therefore, that the charter of the company contains no contract the obligation of which is in any way impaired by the statute under which the commissioners are to act.

2. There can be no doubt that each of the States through which the Mobile and Ohio Railroad passes incorporated the company for the purpose of securing the construction of a railroad from Mobile, through Alabama, Mississippi, Tennessee, and Kentucky, to some point near the mouth of the Ohio River, where it would connect with another railroad to the lakes, and thus form a continuous line of inter-state communication between the Gulf of Mexico in the south, and the Great Lakes in the north.    It is equally certain that Congress aided in the construction of parts of this line of road so as to establish such a route of travel and transportation.    But it is none the less true that the corporation created by each State is for

all the purposes of local government a domestic corporation, and that its railroad within the State is a matter of domestic concern. Every person, every corporation, everything within the territorial limits of a State is while there subject to the constitutional authority of the State government. Clearly under this rule Mississippi may govern this corporation, as it does all domestic corporations, in respect to every act and everything within the State which is the lawful subject of State government. It may, beyond all question, by the settled rule of decision in this court, regulate freights and fares for business done exclusively within the State, and it would seem to be a matter of domestic concern to prevent the company from discriminating against persons and places in Mississippi. So it may make all needful regulations of a police character for the government of the company while operating its road in that jurisdiction. In this way it may certainly require the company to fence so much of its road as lies within the State; to stop its trains at railroad crossings; to slacken speed while running in a crowded thoroughfare; to post its tariffs and time-tables at proper places, and other things of a kindred character affecting the comfort, the convenience, or the safety of those who are entitled to look to the State for protection against the wrongful or negligent conduct of others. This company is not relieved entirely from State regulation or State control in Mississippi simply because it has been incorporated by, and is carrying on business in, the other States through which its road runs. While in Mississippi it can be governed by Mississippi in respect to all things which have not been placed by the Constitution of the United States within the exclusive jurisdiction of Congress, that is to say, using the language of this court in *Cardwell* v. *Bridge Co.*, 113 U. S. 205, 210, "when the subjects on which it is exerted are national in their character, and admit and require uniformity of regulations affecting alike all the States." Under this rule nothing can be done by the government of Mississippi which will operate as a burden on the inter-state business of the company or impair the usefulness of its facilities for inter-state traffic. It is not enough to prevent the State from acting that the road in Mississippi is

used in aid of inter-state commerce. Legislation of this kind to be unconstitutional must be such as will necessarily amount to or operate as a regulation of business without the State as well as within.

The commission is in express terms prohibited by the act of March 15, 1884, from interfering with the charges of the company for the transportation of persons or property through Mississippi from one State to another. The statute makes no mention of persons or property taken up without the State and delivered within, nor of such as may be taken up within and carried without. As to this, the only limit on the power of the commissioners is the constitutional authority of the State over the subject. Precisely all that may be done, or all that may not be done, it is not easy to say in advance. The line between the exclusive power of Congress, and the general powers of the State in this particular, is not everywhere distinctly marked, and it is always easier to determine when a case arises whether it falls on one side or the other, than to settle in advance the boundary, so that it may be in all respects strictly accurate. As yet the commissioners have done nothing. There is, certainly, much they may do in regulating charges within the State, which will not be in conflict with the Constitution of the United States. It is to be presumed they will always act within the limits of their constitutional authority. It will be time enough to consider what may be done to prevent it when they attempt to go beyond.

3. General statutes regulating the use of railroads in a State, or fixing maximum rates of charges for transportation, when not forbidden by charter contracts, do not necessarily deprive the corporation owning or operating a railroad within the State of its property without due process of law, within the meaning of the Fourteenth Amendment of the Constitution of the United States, nor take away from the corporation the equal protection of the laws. *Munn* v. *Illinois*, 94 U. S. 113, 134, 135; *Railroad Co.* v. *Richmond*, 96 U. S. 521, 529; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 354. The great purpose of the statute now under consideration is to fix a maximum of charges, and to regulate in some matters of a police

nature the use of railroads in the State. In its general scope it is constitutional, and it applies equally to all persons or corporations owning or operating railroads in the State. No preference is given to one over another, but all are treated alike. Whether in some of its details the statute may be defective or invalid we do not deem it necessary to inqr..e, for this suit is brought to prevent the commissioners from giving it any effect whatever as against this company.

4. The Supreme Court of Mississippi has decided in the cases of *Railroad Commission* v. *Yazoo & Mississippi Railroad Company*, and *Railroad Commission* v. *Natchez, Jackson & Columbia Railroad Company*, not yet officially reported, that the statute is not repugnant to the Constitution of the State " in that it creates a commission and charges it with the duty of supervising railroads." To this we agree, and that is all that need be decided in this case. As was said by the Supreme Court of Mississippi, in the case first referred to above : " Many questions may arise under it not necessary to be disposed of now, and we leave them for consideration when presented."

5. It is difficult to understand precisely on what ground we are expected to decide that this statute is so inconsistent and uncertain as to render it absolutely void on its face. The statute of Tennessee which was under consideration in *Louisville & Nashville Railroad Company* v. *Railroad Commission of Tennessee*, 19 Fed. Rep. 679, is materially different from this in many respects. That case was decided before this statute was passed, and it is not at all unlikely that the legislature of Mississippi made use of the decision in framing their bill so as to avoid some, if not all, of the objections which, in the opinion of the court, were fatal to what had been done in Tennessee. The argument on this branch of the controversy contains much that might have been useful if addressed to the legislature while considering the bill before its final enactment, but we find nothing in it to show that the statute as it now stands is altogether void and inoperative. When the commission has acted and proceedings are had to enforce what it has done, questions may arise as to the validity of some of the vari-

ous provisions which will be worthy of consideration, but we are unable to say that, as a whole, the statute is invalid.

*The decree of the Circuit Court is reversed and the cause remanded, with instructions to dismiss the bill.*

Mr. Justice Harlan, dissenting.*

This case and the case against the Illinois Central Railroad Company, argued with it, are unlike that of *Chicago, Burlington & Quincy Railroad Co.* v. *Iowa,* 94 U. S. 155, where the charter of the company was granted expressly subject to such rules and regulations as the legislature might, from time to time, enact and provide; or of *Peik* v. *Chicago & Northwestern Railway Co.,* 94 U. S. 164, 175, where, at the time the railroad charter was granted, the State Constitution provided that all charters of corporations " may be altered or repealed by the legislature at any time after their passage;" or of *Winona & St. Peter Railroad Co.* v. *Blake,* 94 U. S. 180, where the charter prescribed no limit upon the legislative power to fix rates for transportation, and conferred no 'express power upon the company to fix or establish such rates as it might deem proper. Different questions from any of these are now presented.

The Mobile and Ohio Railroad Company was chartered on the 3d of February, 1848, by the State of Alabama, with authority to construct and maintain a railroad from the City of Mobile to the west line of that State, towards the mouth of the Ohio River, and to transport and carry property and persons, under such regulations, as to time and manner, as its board of directors might establish. It was also invested by its charter with power, " from time to time, to *fix,* regulate, and *receive* the toll and charges by them to be received for the transportation of persons and property over the line of railroad hereby authorized to be constructed and completed, or any part thereof." § 12. The legislature of Mississippi, in the same month, appoved of the Alabama charter—except in certain particulars not important to be here mentioned—and consented to the

---

* This dissent applies also to the judgment and opinion of the court in - *Stone* v. *Illinois Central Railroad Co., post,* 347.

extension of the road through that State to the Tennessee line; conferring upon the company, when organized, "the same rights, powers, and privileges" that were granted to it within the State of Alabama. Like consent was given, and similar action was taken, by the States of Tennessee and Kentucky, with reference to the proposed road within their respective limits.

The Illinois Central Railroad Company is the lessee of the Chicago, St. Louis and New Orleans Railroad Company. By an act of the legislature of Mississippi, of April 18, 1873, the New Orleans, Jackson and Great Northern Railroad Company, owning a line of railroad from New Orleans, Louisiana, to Canton, Mississippi, and the Mississippi Central Railroad Company, owning a line running from the latter place northward to Jackson, Tennessee, were authorized to consolidate into one corporation; the latter to have all the rights, powers, privileges, immunities, and franchises in perpetuity, then conferred upon the constituent companies, or upon either of them. Such consolidation took place under the name of the Chicago, St. Louis and New Orleans Railroad Company, and by an act of February 28, 1878, was ratified. But the same act provided that it should be of no force or effect until the debt due the State from the Mississippi Central Railroad-Company was adjusted by the Chicago, St. Louis and New Orleans Railroad Company. Subsequently, by an act approved March 1, 1882, the payment of this debt by the latter company to the State was acknowledged, and the Chicago, St. Louis and New Orleans Railroad Company was declared to be a corporation of Mississippi, "with perpetual succession, and, as such, is invested with all the rights, powers, privileges, liberties, and franchises conferred by the act to which this is a supplement, and *especially* the rights and powers .. . . of section 10 of an act entitled 'An Act to incorporate the Mississippi Railroad Company,' approved March 10, 1852."

The 10th section of the act last named, to the rights and powers conferred by which particular reference was made, is in these words : "That the president and directors be and they are hereby authorized to adopt and establish such a tariff of

charges for the transportation of persons and property *as they may think proper, and the same to alter and change at pleasure.*"

The amount paid to the State by the Chicago, St. Louis and New Orleans Railroad Company, on account of the debt due from the Mississippi Central Railroad Company was $158,978.82.

It is thus seen that the Mobile and Ohio Railroad Company, and the Chicago, St. Louis and New Orleans Railroad Company, were given by their charters the power to fix and regulate rates for transportation of persons and property upon their respective roads. This power was, of course, not without limit; for the general grant of the franchises, rights, and privileges enumerated in these charters was attended by the condition, which the law always implies in such cases, that the charges for transportation established by the companies shall be reasonable.

The Mississippi statute of 1884 provides for the appointment of three commissioners, and invests them with the power of establishing—upon the basis of " just compensation," and the protection of persons, localities, or corporations against " unjust discrimination "—a tariff of charges for the transportation of persons and property on any railroad owned or operated in that State. The commissioners, so appointed, are required, in ascertaining such compensation, " to take into consideration the character and nature of the service to be performed, and the entire business of such railroad, together with its earnings from the passenger and other traffic; " to so revise these tariffs " as to allow a fair and just return on the *value* of such railroad, its appurtenances and equipments ; " and to increase or reduce the rates so established " as justice to the public and each of said railroad companies may require," and " as experience and business operations may show to be just." Any person, company or corporation, operating a railroad in Mississippi, who fails to conform to the tariff of charges established by the commission, is made liable to a penalty of $500 for each violation, recoverable in the name of the State.

I am of opinion that this statute impairs the obligation of the contract which the State made with these companies, in

this: That it takes from each of them the power conferred by its charter of fixing and regulating rates for transportation within the limit of reasonableness, and confers upon a commission authority to establish, from time to time, such rates as will give " a fair and just return on the *value* of such railroad, its appurtenances and equipments," and " as experience and business operations may show to be just." In short, the companies are placed by the statute in the same condition they would occupy if their charter had not conferred upon them the power to fix and regulate rates for transportation. The whole subject of transportation rates is thus remitted to the judgment of commissioners who have no pecuniary interest whatever in the management of these vast properties, and who, if they had any such interest, would be disqualified under the statute from serving; and who are required to fix rates, according to the value of the property, without any reference to what it originally cost, or what it had cost to maintain it in fit condition for public use.

It is hardly necessary to discuss the proposition that the right to fix and regulate rates for transportation within the limit of reasonableness was and is one of great practical value to these companies; for, the rates so fixed would have governed the conduct of parties interested in them, unless it was made to appear, affirmatively, and in some legal mode, that they were unreasonable. The object of the construction of the roads operated by these companies was, as the bill avers and the opinion of the court admits, to establish a continuous line of inter-state communication between the Gulf of Mexico and the Great Lakes of the North. In the accomplishment of that object the entire country took a deep interest; for Congress, by grants of land and otherwise, gave those enterprises every possible encouragement. Does any one believe that private capitalists would have supplied the money necessary to establish and maintain these lines of inter-state communication had they supposed that the States through which the roads were extended reserved the right, by commissioners, to take charge of the whole matter of rates, and abrogate, at their pleasure, such tariffs of charges as might be established by the companies

RAILROAD COMMISSION CASES. 341

Dissenting Opinion : Harlan, J., in Stone v. Farmers' Loan & Trust Co.

under the power, expressly conferred, of fixing and regulating rates? Would they have risked the immense sums invested in these enterprises had the charters of the companies contained a provision making rates to depend, not on the capabilities, wants, and interests of the territory to be supplied with railroad service, or on the amount expended in constructing and maintaining these roads, but on their "*value*" as estimated by commissioners, and on such basis as the latter, from time to time, might deem to be justified by "experience and business operations?" Their value, upon what basis, or at what period of their existence? When they were constructed? Or what they would bring at a sale under a decree of court? In the place of charter provisions, under which rates fixed by the companies would be deemed legal until the contrary was made to appear, the statute substitutes a system under which rates established by a commission, and by it increased or diminished from time to time, must be observed by the companies, unless it is made to appear, affirmatively, that such rates are "unjust,"—officers and agents of the companies, acting in conformity with express provisions of their charters, being made liable to heavy penalties, unless they prove that the commission have established an "unjust" tariff of charges.

The court concedes that the power which the State asserts, by the statute of 1884, of limiting and regulating rates, does involve the power to destroy or to confiscate the property of these companies; and, consequently, it is said, the State cannot compel them to carry persons or property without reward, nor do that which in law would amount to a taking of private property for public use without just compensation. And reference is made to that clause of the statute which provides "that in all trials of cases brought for a violation of any tariff of charges, as fixed by the commission, it may be shown in defence that such tariff so fixed is unjust." But if I do not misapprehend the effect of the opinion, it means to declare that where the tariff of charges fixed by the commissioners does not certainly work the destruction or confiscation of these properties, or amount in law to taking them for public use without just compensation, the charges so established must be accepted by

the courts, as well as by the companies, as reasonable, and, therefore, not be held or treated as " unjust " in any prosecution under the act for disregarding such tariff. I cannot otherwise interpret the observation that the legislature may establish a maximum, any charge in excess of which must be deemed by the courts and the parties to be unreasonable.

In expressing the foregoing views I would not be understood as denying the power of the State to establish a railroad commission, or to enforce regulations—not inconsistent with the essential charter rights of the companies—in reference to the general conduct of their merely local business. My only purpose is to express the conviction that each of these companies has a contract with the State whereby it is exempted from absolute legislative control as to rates, and under which it may, through its directors, from time to time, within the limit of reasonableness, establish such rates of toll for the transportation of persons and property as it deems proper— such rates to be respected by the courts and by the public, unless they are shown affirmatively to be unreasonable.

The bill, in my judgment, makes a case that justifies a court of equity in interfering to prevent the commissioners from imposing upon the defendants any such tariff of charges as the statute in question authorizes them to establish in reference to their business exclusively within the State of Mississippi. As the court withholds any expression of opinion as to the validity of the statute when applied to inter-state commerce, that is, to the transportation of persons and property taken up out of the State and put down in the State, or taken up in the State and put down out of the State, I have no occasion to discuss that question. For the reasons stated, I dissent from the opinion and judgment of the court in these cases.

Mr. Justice Field, dissenting.*

I concur with Mr. Justice Harlan, that the act of Mississippi impairs the obligation of the contract contained in the charter originally granted to the Mobile and Ohio Railroad Company

---

* This dissent applies also to the opinion and judgment of the court in *Stone* v. *Illinois Central Railroad Co.*, *post*, 347.

by Alabama, and soon afterwards adopted by Mississippi. At that time it was a matter of great public interest to have railway communication between the Gulf of Mexico and the Ohio River, passing through Alabama, Mississippi, Tennessee, and Kentucky, and to secure it these States, by legislative acts passed in February, 1848, incorporated the company, to construct, equip, and operate a railroad from Mobile, in Alabama, to a point opposite Cairo, in Illinois, at the junction of the Mississippi and Ohio Rivers. The road was to run, as thus seen, many hundred miles, part of which was in a country sparsely settled and in some places covered by almost irreclaimable swamps. It would require several years and the expenditure of many millions for its construction. The return for the heavy investment was to be in the distant future when the country should become more densely populated, and its resources better developed. It was a difficult matter to secure the necessary capital for an enterprise so costly in its character, so remote in its completion, and so uncertain in its returns. To effect this the several acts of incorporation authorized the president and directors of the company to adopt and establish such a tariff of charges for the transportation of persons and property as they might think proper, and to alter and change the same at pleasure. The bill alleges—and the allegation must be taken as true on the demurrer—that it was also understood by all parties, that when the road was completed it should be managed by officers selected by the stockholders; and adds that this right of selecting its officers and of charging and receiving what it should fix as its tariff, was not only a material part of the contract, but was the sole inducement or consideration upon which it was entered into by the company.

Certainly no one will deny that the right to adopt a rate of charges, subject, as such rate always is, to the condition that they shall be reasonable, was of vital importance to the company. Without that concession no one acquainted with the difficulties, expenses, and hazards of the projected enterprise, can believe that it would have been undertaken. It was certainly the expectation of the constructors of the road that

they should be allowed to receive compensation having some relation to its cost. But the act of Mississippi allows only such compensation as parties appointed by the legislature, not interested in the property, nor required to possess any knowledge of the intricacies and difficulties of the business, shall determine to be a fair return on the *value* of the road and its appurtenances, though that may be much less than the original cost. Within the last few years, such have been the improvements in machinery, and such the decline in the cost of materials, that it is probably less expensive by one-third to build and equip the road now than it was when the constructors completed it. Does anybody believe that they would have undertaken the work or proceeded with it, had they been informed that, notwithstanding their vast outlays, they should only be allowed, when it was finished, to receive a fair return upon its value, however much less than cost that might be?

Under the charter the company could make such reasonable discriminations in its charges dependent upon the amount of business done, the character of the material transported, the existence of competitive lines or points, as its interest might suggest, and which, to some extent, are indispensable to the successful management of the business of every railway company. Differences in the bulk of property of the same weight, differences in value and in liability to breakage or decay, exact different degrees of care and speed in its transportation, and consequently require and justify different charges. And all experience shows that, where competition by water or otherwise exists, variations in charges must be made from time to time to secure any portion of the business. These considerations must have had their influence with the stockholders when they accepted the charter and undertook the construction of the road. The act of Mississippi, which the court says is the exercise of a lawful right to interfere with the affairs of the company, never relinquished nor qualified by any stipulation, declares that no discrimination shall be made in the charges of the company in any case. Its language is, that "any person or corporation engaged in transporting passengers or freight over any railroad in this State, . . . who for his or its

advantage, or for the advantage of any connecting line, or for any person or locality, shall make *any* discrimination against any individual, locality, or corporation, shall be guilty of extortion." And in such cases the injured party can recover double the amount of damages sustained by him, and the offending party is declared to be guilty of misdemeanor and subject to a fine from ten to five hundred dollars. The harshness and impolicy of such legislation are well shown by illustrations mentioned by counsel. If, for instance, where its road touches a navigable stream, the company charges less per pound per mile for transportation to a distant point which can be reached by water, than it does to an inland station, it makes a discrimination against the latter station, and is guilty of extortion, although the transportation would otherwise not be given to the company: If it charges more per pound per mile for local than through freights, it makes a discrimination and may be punished for extortion. If it charges more per pound per mile for silks than for cotton goods, or for gold bullion than for cast iron, or for tea than for coal, it is guilty of a like discrimination and extortion. If it attempts to encourage the cultivation of fruits, or the manufacture of cotton, woolen, or silken fabrics, or any other industry along its line of road by a reduction of rates until the business is established, it makes a discrimination, and if higher rates are charged to others the exaction of the difference is to them extortion. As well said by counsel, it makes no difference whether the discrimination be founded on value, volume, distance carried, return haul, competition, regularity of shipment, or whether the article transported is perishable or not, it is prohibited, and if made is extortion; and thus, as he well observes, the act of Mississippi pays no attention to the common sense of the world, to the laws of commerce, or to universal custom. Reductions of rates made in the interests of charity and benevolence, for the poor, sick, or infirm, if not also extended to others, would under it be criminal. Indeed, under the law no cause can exist which would justify *any* discrimination.

I am aware that this court has held that, unless restrained by express contract, the legislature of a State has the right to

prescribe a maximum for charges for transportation of persons and freight over railways within her limits; but it has not been generally supposed that different rates, under certain circumstances, may not be made within the maximum in the interest both of the company and of the public. And the right itself must necessarily be subject to the qualification, that the prescribed maximum shall at least equal the cost of the service required.

Again, the right of the company to appoint all necessary officers, agents, or servants would seem to be essential to secure competent and efficient men for the successful management of its business. Few individuals or companies would undertake an enterprise requiring skill, experience, and large expenditures, if those who were to conduct it were not to be selected and controlled by them, but by parties appointed, perhaps, under political influences, and possibly without the requisite knowledge and experience. The efficiency and fidelity of employees would be better assured by leaving their appointment to those interested in the judicious management of the business of the company. Indeed, their usefulness and fidelity would seldom be secured in any other way. No one, therefore, can believe that the original stockholders would have accepted the charter and undertaken the work, if this right of appointing those who were to carry out and manage it when completed was to be withdrawn from them. The act of Mississippi is so plain an impairment of this essential right, that I should not have supposed there could be any question on the point, did I not find that a majority of my associates are of opinion that it is an entirely constitutional proceeding on the part of the legislature, in no wise interfering with the contract of the company.

I have no doubt that commissioners may, for many purposes, be appointed by the legislature; but I am not prepared to say that the direction and control of the business of the company can, unless a cause of forfeiture or repeal of its charter exists, be taken from it and confided to them, any more than its business can be changed from transportation to manufacturing or banking. The right to elect officers to direct and control its affairs, and to pursue the same kind of business for which it was

formed, must be maintained in any regulations prescribed for its government, or we must admit that the power of the legislature over the corporation is, in spite of constitutional limitations, as absolute as that of the Parliament of Great Britain. Indeed, the argument which supports the statute of Mississippi seems to proceed upon the ground that such is the legitimate outcome of the decisions of this court with respect to the control which the legislature may exercise over such corporations, irrespective of any stipulation in their charters. If such be the result of the decisions, it is important that it should be known, in order that parties interested in railway property may see that their protection against unreasonable and vindictive measures is not by appeal to the courts, but by efforts to secure wise and intelligent action from the legislature.

MR. JUSTICE BLATCHFORD did not sit in this case or take any part in its decision.