## U. S. LIGHT & HEAT CORPORATION v. NIAGARA FALLS GAS & ELECTRIC LIGHT CO. et al. (HAMANN, Intervener).

District Court, W. D. New York. November 4, 1927.

1. Gas ⊜➙14(1)—Prospective user of gas has property right to gas service at reasonable charge without discrimination.

Prospective user of gas, as well as consumer, had property right to gas service at reasonable charge without discrimination in favor of one user as against another, springing from contract investing private property to public use.

2. Gas ⊜➙14(1)—Gas company had property right entitling it to fair rate of compensation for service.

Gas company had property right entitling it to fair return of compensation for its outlay, made necessary by its service to each consumer, and a reasonable profit from its operations, springing from contract investing private property to public use, since it then ceases to be juris privati only.

3. Gas ⊜➙14(1)—One sustaining injury to property right by unjust gas rate may have redress without awaiting action of another.

One sustaining injury to his property right by misuse of franchise, or by exacting an unjust rate, has right to redress without awaiting action of another, except that user, or one deprived of use, including gas company, must abide regulations lawfully enacted by state for conduct and supervision of business of supplying gas, and covering authorized rates or charges, unless enactment is confiscatory of property either of him who serves or is served.

4. Gas ⊜➙14(1)—Evidence held to show gas rate denied right of purchasing gas at reasonable price and right to earn reasonable rate for service (Public Service Commission Law N. Y. § 65, subd. 6, as added by Laws N. Y. 1923, c. 898).

Evidence held to support master's finding that existing gas rate, a rate excluding service charge, or any rate which could be established under Public Service Commission Law N. Y. (Consol. Laws, c. 48), § 65, subd. 6, as added by Laws N. Y. 1923, c. 898, denied to prospective user and users of gas right of purchasing gas at reasonable price, and

to gas company right to earn reasonable rate and cost of its service to each consumer, so that it was practically compelled to operate its plant at yearly loss and without enabling it to obtain fair return on its investment.

**5. Statutes ⬥158—To repeal statute by implication, legislative intent must be clearly apparent.**

To repeal statute by implication, legislative intent to do so must be clearly apparent.

**6. Gas ⬥14(1)—Statute prohibiting service charges held not to repeal statute providing that gas corporations may establish classifications of service (Public Service Commission Law N. Y. § 65, subd. 5, and subd. 6, as added by Laws N. Y. 1923, c. 898).**

Public Service Commission Law N. Y. (Consol. Laws, c. 48) § 65, subd. 6, as added by Laws N. Y. 1923, c. 898, prohibiting gas corporations from making service charges, *held* not inconsistent with subdivision 5, providing that nothing in chapter shall be taken to prohibit gas corporation from establishing classifications of service based on quantity used, purpose for which used, duration of use, or on any other reasonable consideration and providing schedules of just and reasonable graduated rates applicable thereto, so as to repeal it by implication.

**7. Gas ⬥14(1)—User's remedy by complaint to commission held inadequate, where commission had denied gas company's application to change rates (Public Service Commission Law N. Y. §§ 71, 72).**

Remedy of prospective user and user of gas under Public Service Commission Law N. Y. (Consol. Laws, c. 48) §§ 71, 72, conferring right of investigation, followed by hearing and establishing of just and reasonable rates, *held* inadequate, where commission had, on application of defendant gas company, denied right to make service charge deemed necessary to make reasonable rates.

**8. Constitutional law ⬥48—Law regulating gas companies and authorizing commission to establish rates will be held unconstitutional only in clear case.**

Act of Legislature regulating gas companies and authorizing Public Service Commission to establish rates should not be lightly nullified, and only in clear case will its action be held unconstitutional by courts.

**9. Constitutional law ⬥298(7)—Gas ⬥14(1) —Statute prohibiting service charges by gas companies held confiscatory and unconstitutional (Public Service Commission Law N. Y. § 65, subd. 6, as added by Laws N. Y. 1923, c. 898).**

Public Service Commission Law N. Y. (Consol. Laws, c. 48) § 65, subd. 6, as added by Laws N. Y. 1923, c. 898, prohibiting gas companies from making service charges *held* arbitrary, confiscatory, an impairment of contractual rights and in violation of constitutional rights of both users and gas companies, since in prohibiting service charge to consumers gas company was estopped from allocating cost of production to consumers in equal proportions, and was prevented from earning reasonable profit on its invested capital.

**10. Gas ⬥14(1)—Users of gas held entitled to restrain Public Service Commission from enforcing rate which did not fairly allocate part of service cost to each consumer.**

Prospective user and user of gas *held* entitled to injunction restraining Public Service Commission from enforcing rate which did not fairly allocate part of service cost to each consumer, so as to include an equitable return in compensation to gas company for like services to each consumer and also to reimburse gas company for its costs and expenses based on consumer's demand for service.

In Equity. Suit by the United States Light & Heat Corporation against the Niagara Falls Gas & Electric Light Company and others, in which Adolph M. Hamann intervened as party plaintiff. On exceptions to Master's report and motion for injunction. Decree for complainants.

The report of the special master is as follows:

"This is a suit in equity, brought by the United States Light & Heat Corporation against the Niagara Falls Gas & Electric Light Company, William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, James A. Parsons, as commissioners of the Public Service Commission of the state of New York, and the city of Niagara Falls, N. Y. The city of Niagara Falls is a party defendant by reason of the franchise granted to the gas company by that municipality. An individual consumer, Adolph A. Hamann, has also intervened, pursuant to an order of this court as party plaintiff, and injunction is asked by the complainants restraining the defendant Niagara Falls Gas & Electric Light Company from obeying certain orders of the Public Service Commission hereinafter referred to, which command, among other things, that such company shall not enforce or collect under certain schedule of rates for gas sold, filed with the commission on February 15, 1924, and which schedule set forth certain rates for gas to be charged in the city of Niagara Falls on a basis for rate or charge known as the three-part rate. Judgment is also asked that the gas company be restrained from obeying the orders of the commission, dated December 28, 1920, and June 1, 1921, by which orders the defendant was ordered to charge a flat rate of $2.45 per 1,000 cubic feet.

"Judgment is also asked that the Public Service Commission be restrained from enforcing the orders of the Public Service Commission in case No. 1547, dated December 28, 1920, June 21, 1921, and March 5, 1924, and from visiting any penalty on the

defendant gas company for disobeying any such orders or any of them. Injunctive relief is also asked, restraining the Niagara Falls Gas & Electric Light Company from complying with chapter 898 of the Laws of 1923 of the state of New York, and also enjoining the commission from enforcing such chapter 898 of the Laws of 1923, and from visiting any penalty upon the gas company for violating such chapter 898 of the Laws of 1923.

"An order was made by this court on May 24, 1924, appointing the undersigned special master to take the testimony in this case and to report the same with opinion thereon to this court. The defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, and James A. Parsons, constitute the Public Service Commission of the state of New York. The defendant city of Niagara Falls is the place of operation of the defendant Niagara Falls Gas & Electric Light Company.

"It is claimed by the plaintiff and defendant gas company that the right to furnish gas at a reasonable and fair price on the part of the defendant gas company, and the right to purchase gas at a fair and reasonable price on the part of the plaintiff, is each a property right. It is also claimed by the plaintiff and the defendant gas company that without a service charge in its rate structure the defendant gas company cannot furnish gas to the plaintiff, or any consumer at a fair and reasonable price; that without a service charge in its structure any rate that might be fixed by the Public Service Commission would be inadequate to bring the defendant gas company a fair return upon its capital invested, or to pay the expenses of operation and is therefore confiscatory. It is also claimed by both the plaintiff and defendant gas company that with a statute precluding a service charge a large proportion of the consumers are forced to pay a sum in excess of the value of the service rendered to them in gas supplied, and that a large percentage of its consumers receive the service and gas under cost to the defendant gas company, and that therefore a rate structure without a service charge is unconstitutional, in that it fails to give the consumers equal protection of law.

"Hamann is a consumer of the gas manufactured and distributed by the defendant gas company. He claims that the price of gas at the rates fixed by the Public Service Commission was so excessive when adapted to his purposes as a householder that he has

been forced to cut down his volume of consumption, and to substitute other heating agencies which are not as efficient; that by reason of the meter rate in force he has been obliged to pay materially in excess of the reasonable value of the service received by him, due to the fact that the rate was arbitrarily loaded for the purpose of requiring him and all other consumers similarly situated—i. e., whose consumption was sufficient to return a profit to the gas company—to pay toward or make up the deficit caused by those consumers whose consumption was so small that a deficit as to them resulted; and that by reason thereof his property was taken without reasonable compensation, and without due process of law, and that he was denied the equal protection of the laws, all in violation of his constitutional rights.

"Answers were filed by the defendant Niagara Falls Gas & Electric Light Company, city of Niagara Falls, and the public service commissioners. The answer of Niagara Falls Gas & Electric Light Company substantially admits the allegations contained in the complaint, and alleges that under the rates fixed by the Public Service Commission it is operating at a loss and that it has a franchise from the state of New York authorizing it to do business in the state of New York, for the manufacture and sale of gas, also franchises from the city of Niagara Falls permitting it to serve and sell manufactured gas to the inhabitants of said city; that the rates prescribed by the Public Service Commission of the state of New York do not enable it to make a fair return upon its investment, resulting in a violation of its contractual rights and a confiscation of its property. The gas company's answer further shows that it filed a schedule of rates with the Public Service Commission of the state of New York (Second district), the structure of which contained what is substantially, though under another name, a service charge. Because of chapter 898 of the Laws of 1923, the Public Service Commission ruled that the gas company could not put such rates into effect. The defendant gas company asks that the Public Service Commission of the state of New York and the defendant city of Niagara Falls be enjoined from interfering with the collection of a reasonable rate, and that the Public Service Commission be enjoined from visiting any penalty on the defendant gas company for its violation of chapter 898 of the Laws of 1923.

"The effect of the allegations in the complaint and the answer of the defendant gas company is a demand that chapter 898 of the

Laws of 1923, which amends section 65 of the Public Service Commission Law of the state of New York (Consol. Laws, c. 48), by adding subdivision 6, be declared unconstitutional under the Fourteenth Amendment of the Constitution of the United States, and the plaintiff and plaintiff-intervener ask that the defendant gas company be enjoined from charging for its gas either a flat rate, flat rate with service charge, flat rate with a minimum bill, block rate, or block rate with a minimum bill. Complainants and defendant gas company all maintain that the legislative prohibition by such statute of a service charge deprives all such parties of a property right, as does also the requirement to serve gas under any of the rate forms last mentioned. The property right of the complainant and intervener is the right to purchase gas at a reasonable price and an equitable rate as between different classes of consumers. That of the gas company to furnish gas to the public in the community served by them at such a rate as will secure equity between the different classes of consumers, a broader consumption if equitable rates are allowed as between different classes of consumers, and the right to realize a reasonable return upon their investment, from all classes of consumers, of which they are deprived by the legislation under consideration. Section 6 reads as follows:

" '6. *Services Charges Prohibited.* Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed.'

"The defendant city of Niagara Falls in its answer alleges that the defendant gas company has been charging all residents of Niagara Falls for gas and gas service for both domestic and industrial uses and purposes an unjustly high, unwarranted, and prohibitive rate, in violation of its contract with the city of Niagara Falls, and in violation of the rights of its residents. It denies any knowledge or information sufficient to form a belief as to the truth of the allegations contained in the complaint relative to rate structure.

"The answer of the defendants Public Service Commissioners admits that a schedule of rates was filed by the defendant gas company with said Public Service Commission, to take effect on or after September 20, 1923, which said rates had, as part of their structure, a service charge, and further admits that it ordered that said rates must not be enforced and collected, on the ground that it had been determined that the same were illegal under chapter 898 of the Laws of 1923, and further ordered that said schedule may not be accepted for filing and that the schedule be forthwith returned to the defendant gas company. Said answer further admitted that under the laws of the state of New York the defendant gas company was required to render its service to the owner or occupant of any building within 100 feet of any main laid down by said gas company. The answer denies the allegations contained in the complaint relative to the necessity of including a service charge in the rate structure. The commission claims that under subdivision 5 of section 65 of the Public Service Commission Law an equitable rate may be established as far as all parties are concerned, notwithstanding the existence of subdivision 6 already quoted. Here is the essence of the controversy.

"The Public Service Commission has sworn no witnesses, except to produce Mr. Ingraham, acting secretary of the commission, who produced certain orders of that tribunal, prescribing the rules and regulations governing the preparation and filing of rates of gas, electrical, and steam public service corporations, and certain tariff schedules, showing rates being charged for gas by said corporations in their respective districts and municipalities in the state of New York. These are the last tariff schedules filed by each of such companies and not subsequently changed or modified. This comprises the entire proof submitted by the commission.

"Witnesses were produced by the plaintiff and intervener and the defendant gas company showing the rate structures throughout the United States, the effect on the consumers and gas companies of a service charge included in such structures, and the effect of a prohibition from such inclusion. The witnesses of complainant and the codefendants consisted of public service engineers, accountants, public service commissioners, and others connected with the operation of gas companies from many large cities scattered throughout the United States. The testimony of these witnesses shows the gas companies operating under a meter rate—that is, a rate of so much per 1,000 cubic feet —with one or two exceptions are not receiving and never have received enough income in the aggregate to provide reimbursement and a fair return, and that this result is inevitable and inescapable under the meter rate, or under the several variations thereof, as I shall set forth at greater length hereafter.

"When the rate is raised by authority the result is to increase the burden of the small percentage of profitable consumers who are large users, and not to appreciably gain any contribution from the remainder. Increase of rate almost invariably results in a loss of customers and an ultimate reduction of revenue. There is no way of fixing a perfectly equitable rate. To do this it would be necessary to fix a different rate for each customer. The rate depending upon the amount of gas used, pressure, time when used, his distance from the source, constancy of demand, the amount of bookkeeping required, and several other factors.

"It clearly appears from the testimony that, where a gas company is operating under a meter rate, a large percentage of the company's consumers do not take enough service or pay enough money to reimburse the company for those services which the company renders to all consumers. The witness Thomas C. O'Hare testifies that this percentage would run from 30 to 40 per cent. It also appears that under the meter rate system there is another class of customers who pay the gas company enough money and take enough service to reimburse the company for the service, but not enough to fully reimburse the company for those services and the other outlay that the company makes for the benefit of these consumers, and pay the company a fair return on the investment. The witness Thomas C. O'Hare testifies that in his experience that percentage is about 35 per cent. This testimony was borne out by the statements of all of the witnesses sworn. Although a few of the witnesses did not go into actual percentages, they testified that there is a large and material percentage of consumers in each class.

"Typical of this condition, and one of the few cases of a company in receipt of a fair return, is the case of People's Gas Light & Coke Company, which provides gas service in the city of Chicago, Ill., having 752,000 consumers. Mr. Theodore V. Purcell, vice president of that company, testified as follows:

" 'Q. Have you made an examination for the purpose of ascertaining what percentage of your consumers are carried by the company at a financial loss to the company? A. Yes; I have, several times.

" 'Q. And what is that percentage? A. Well, you would have to qualify it somewhat and divide it into groups. The group that just barely pays operating expenses and no return whatever on the fixed charges of the company is 33 per cent. of the whole. Now there is another group that begins to pay some return, but does not pay a complete return. Up to the point of a complete return the percentage is an additional 47 per cent.; * * * an additional 47 per cent., making the total of 80 per cent. that do not pay a full return.

" 'Q. Then, of your 752,000 consumers, 33 per cent. of them by reason of the small quantity of gas they take do not return to the company enough money to reimburse the company for its operating costs, is that it? A. Well, we don't include generally in the expression operating costs the fixed charges.

" 'Q. No; I don't mean fixed charges. A. They do pay operating costs, but not a return on the investment.

" 'Q. They do pay operating costs? A. Yes; but no return on the investment.

" 'Q. In addition to that there are 47 per cent. more who do pay the operating costs, but do not pay enough to cover that and the fixed charges and the fair return that the company on its invested capital is entitled to receive? A. Not the full fair return.

" 'Q. You are operating under a regulatory body? A. Oh, yes.

" 'Q. And your rate is fixed by that body? A. By that body.

" 'Q. You are familiar, Mr. Purcell, with the various rate forms that have been in existence and tried out in the gas industry? A. I am.

" 'Q. How is the deficit made up that is created by the 80 per cent. of deficit consumers you have spoken of? A. The deficit is paid by the 20 per cent. necessary to complete the 100 per cent.

" 'Q. Then in the operation of your company 20 per cent. of your consumers take enough gas service, so that the company is reimbursed for the losses created by the 80 per cent? A. That is the fact.

" 'Q. Can you tell us, Mr. Purcell, what the deficit created by the 80 per cent. you have spoken of amounts to per year in dollars? A. It is approximately $3,000,000.

" 'Q. Then, out of the 752,000 consumers, 150,000 consumers are paying for the service they receive and approximately $3,000,000 more. A. And its cost to us.

" 'Q. And its cost to you, plus your return? A. The cost and a fair return.

" 'Q. That is, your company is making in the aggregate a fair return? A. It is.

" 'Q. What justification, Mr. Purcell, is there for taking $3,000,000 out of 20 per cent. of your consumers over and above compensation from them for the services you ren-

der them plus 8 per cent. on the capital invested to enable you to give the service? A. In my opinion there can be no moral justification of that.

" 'Q. It simply is due to the fact, is it not, that the flat rate, either that pure and simple or with some of the variations, such as service charge, minimum bill, or block rate feature, has been in existence so long, and it exists to-day; is that the reason for it? A. That seems to be the reason.

" 'Q. What do you say as to whether a rate that permits that condition or produces that condition is either fair or scientific? A. Well, it is neither fair nor scientific.

" 'Q. Would you say that under that rate one set of consumers—that is to say, the 20 per cent., the profitable consumers in your company—is being exploited for the benefit of the remaining 80 per cent? A. I suppose that word "exploited" covers the situation.'

"Another striking instance is that of the Consolidated Gas Company, of Greater New York, which in 1925 served 1,149,845 consumers. The boroughs of Brooklyn and Richmond, having a population of 2,296,907, are served by other companies. Assuming these boroughs, on the basis of population, produced the same percentage of consumers, that would add 273,753, making a total number of consumers in Greater New York of 1,423,598, and, on the basis of the Chicago deficit, the annual deficit for the city of New York would be $5,694,393. In the basis of population, the deficit in New York City would be something like $13,000,000.

"The testimony of the vice president of the Consolidated Gas Company is substantially a repetition of the testimony above quoted, except that in this case the company is not in receipt of a fair return, nor was the witness able to state the exact amount of the deficit created by the first and second class of consumers above spoken of. The uncontradicted testimony of these witnesses, in striking an average for the entire United States is that 38 per cent. of all the consumers of all the gas companies do not pay for gas service sufficient to reimburse the gas companies for the cost to them of having these consumers on their lines; that 33 per cent. of all consumers of all gas companies throughout the United States do not pay for gas service sufficient to reimburse the gas companies for the actual necessary disbursements made by the company in serving them, plus a fair return upon the company's investment; that the remaining 29 per cent. of all consumers throughout the United States pay enough to the company to reimburse the company fully for the services rendered to them, plus a fair return upon that part of the company's capital necessarily invested for the benefit of, or services to, this last class of consumers, and that this last class also usually pays in addition some part of the deficit created by the other two classes, but in only two instances, as I now recall the testimony, enough to make up the entire deficit, plus a fair return to the gas company upon its entire necessary invested capital.

"It is the universal experience of the gas companies throughout the United States (when I say United States, I mean that no area where gas service exists has been omitted), that the demand for service differs with each consumer, differs in the volume of gas taken per hour, per day, per week, per month, and per year, differs in the time of consumption, differs in the speed at which the gas is taken; that is to say, that one consumer may take in one hour or one day ten times as much gas in volume as another consumer will take in the same period of time or in a very much longer period of time. Some consumers will take their entire consumption during three short periods of the 24-hour day, other consumers will take their consumption at a steady average per hour, per day, per week, per month, and per year. Others will take their consumption not at all during certain weeks or months of the summer, and again during certain weeks or months of the winter. Others take no service Saturday afternoons, Sundays, and holidays.

"It appears that the gas company has no way of controlling or regulating the demand of consumers under a meter rate. The consumer may make the demand at such time as he elects and the amount demanded may be large or small. It appears that domestic consumers have widely different demand possibilities by reason of the sizes of their residences and the nature of their equipment. A greater provision is made for a larger prospective demand than for a smaller. Under the meter rate all consumers pay the same rate for gas. The result is that the cost to the gas company maintaining its plant, distributing system, office, and bookkeeping to the prospective consumers who use little or no gas, has to be borne in whole or in part by the consumers from whom the gas company collects more revenue than the cost of its service to them.

"The gas company is required by law to furnish service and gas to those within 100 feet of its mains, who demand it. If the consumer or prospective consumer who has demanded this service uses little or no gas, the

cost of furnishing that gas and service is not paid by such consumer. That cost must either be paid by another class of consumers or the gas company must suffer the loss. The testimony clearly shows that an increase in rates will not remedy this situation. An increase in rates results in a loss in the number of customers and in the consumption and ultimately a loss of revenue to the company. It also results in a greater inequality of value received as between consumers. It is established that throughout the entire gas industry of this country one class of consumers is paying much more than a reasonable rate or price for the gas service which it receives, due solely to the fact that so large a percentage of consumers pay less than a reasonable price for the services which they receive.

"There are 2,400 consumers of defendant gas company. These are put into three different classes: First, those who fail to pay the cost of service including operation, maintenance, and depreciation; second, those who pay the cost of maintenance and operation, but who do not pay a fair return on investment to the company; and, third, those who pay the cost of operation and a fair return. There are 1,750 customers in the first class, being about 70 per cent. of the total; there are 425 in the second class, being about 17 per cent of the total; and there are 325 in the third class, being about 13 per cent. of the total.

"The rate charged by the defendant gas company is $2.30 per 1,000 cubic feet, which rate is established by order of the Public Service Commission made on December 28, 1920. Subsequent to the order directing said rate, defendant gas company filed a rate schedule with the Public Service Commission, which was disallowed because a service charge was part of that structure, as stated more fully above. The defendant gas company was incorporated and began business in January, 1900. It has never paid a dividend to its stockholders. It has never earned interest on its bonded indebtedness and has accumulated a deficit of over $600,000. Prior to 1912, defendant gas company's flat rate was $1.30 per 1,000 cubic feet. In 1912 the rate was increased to $1.55 per 1,000 cubic feet. The company's deficit customers increased 20 per cent. and its profitable customers decreased 30 per cent. In 1917 the rate was increased to $1.87 per 1,000 cubic feet, and the company's deficit customers increased 15 per cent., and the profitable customers decreased 20 per cent. In 1921 the rate was increased to $2.30 per 1,000 cubic feet, and the company's deficit customers increased 10 per cent., and the profitable customers decreased 15 per cent.

"The rates charged Hamann for gas were $1.30 per 1,000 cubic feet from 1912 to 1917, $1.55 to 1919, $1.87 to 1921, and $2.30 to the time of the commencement of this action. The defendant gas company's books show that there were 17 customers for the month of December, 1924, who consumed in the aggregate the same volume of gas taken by the intervener, Hamann, and that there is an average of 200 accounts per month that show no consumption of gas at all. Mr. Hamann's bill for the month of December, 1924, for gas consumed, was $21.62. If a three-part rate, as filed by the defendant gas company with the Public Service Commission, had been in effect at that time, his bill would have been between $8 and $10—less than one-half. His bill for the entire year would have been less than $100, instead of $196.96, which he paid. Mr. Hamann's principal use of gas was for a hot water heater. It appears, however, that if the drop in expense to the gas company was not over 60 cents per 1,000 cubic feet, the saving in operating expenses would not be over $30, so that the loss to the gas company in net earnings decreased over $70, with this consumer changing to electric heating.

"The plaintiff is a manufacturer of storage batteries. Its need for gas was for the purpose of melting lead for use in its batteries. At present it uses fuel oil. In 1923 it used 307,902 gallons. The cost was 6.56 cents per gallon. Gas is a much more efficient fuel than oil for the purposes of the plaintiff. Plaintiff shows its desire to purchase of the defendant gas company in large quantities, provided it can purchase it at a reasonable rate, and if the gas could be purchased at the rates filed with the Public Service Commission by the defendant gas company on the 5th day of February, 1924, the plaintiff could substitute gas for the oil being used by it at a saving of more than $10,000 per annum, and at a gain in efficiency.

"It appears from the testimony that the various increases in rates made by the defendant gas company failed to materially increase its net revenue. On the 15th day of February, 1924, it filed with the Public Service Commission a schedule of rates which are based on the three-part rate plan. This rate is composed of three parts, one being called the customer's charge, consisting of the expense of bookkeeping, collecting, setting up, removing, and repairing meters, gratuitous complaint service, office rent, meter reading, and part of the fixed charges on physical property. These expenses are identical for all customers, regardless of whether they use gas in large or small quantities or no gas at all.

"Another part is the demand charge, which consists of that part of the company's expense incidental to providing and maintaining a production, transmission, and distribution system of sufficient capacity to render service as required. The principal elements in this cost are the remainder of the fixed charges, among which are interest, taxes, and depreciation on the necessary plant, and part of the operating and maintenance expense of the physical property. This charge is distributed among the customers in proportion to the demand made upon the company by each consumer. The third part is the gas charge, and is that part of the cost of the company's producing, transmitting, and distributing the gas which is proportional to the amount of gas handled.

"Without exception, every one of the 43 witnesses who testified as rate experts, and also Dr. Thomas S. Adams, professor of economics at Yale University, testified that the application of the three-part rate, in so far as it was humanly possible so to do, would result in exact equity between consumers as among themselves and between the consumers and the gas company; that such rate applied would and must result that the company would receive from each consumer complete reimbursement, plus a fair return, and no more; and that each consumer would pay for that service which he had received, and no more, and the burden of one would not and could not be borne by another.

"This action was begun after the Public Service Commission had issued the order already referred to, rejecting the defendant gas company's schedule on the ground that it conflicted with chapter 898 of the Laws of New York for 1923, which forbade a service charge or a charge for the installation or use of apparatus. The defendant gas company introduced upon the trial testimony of many rate experts who were familiar with the operation of gas plants throughout the United States. From the testimony it appears that it is the general experience of the gas industry throughout the United States that the demands or requirements of different customers vary both in the volume of gas taken over any given period and in the speed in which it is taken.

"The evidence of these witnesses is lengthy, cumulative, and, as already stated, it is uncontradicted. Testimony was taken in many localities. Their occupations include former public service commissioners of the state of New York, present commissioners of other states, present public service commission engineers of the state of New York, former engineers of Tennessee, Alabama, Wisconsin, Washington, Pennsylvania, and Kansas, and city officials from various states. There has also been marshaled a small regiment of gas company officials, familiar with the building of rate structures and their effect upon the gas business as a profitable venture. These officials and experts hail from New York, Rochester, Buffalo, St. Louis, Chicago, Boston, Milwaukee, Syracuse, Providence, San Francisco, Oklahoma, New Orleans, Canada, and other cities, and in my opinion the testimony of these witnesses covers every area in the United States where gas service, either natural or artificial, is being rendered.

"It appears that 38 per cent. of all the consumers of all the gas companies in the United States do not take sufficient gas service to reimburse the company for its actual operating expenses necessary to supply gas to them. This computation was made from the records of about 25 cities operating in different states, ranging from Washington in the northwest, Georgia in the southeast, and from Connecticut to Oklahoma, and covering 300 companies. This deficit is caused in large measure by the varying demands of consumers, based on the speed of consumption and the time of the day and year when the demand for service is made. It further appears that there is another class of consumers, constituting about 33 per cent. of the total, who take enough gas service to reimburse the company for its actual operating service on their account, but do not give a fair return on the value of the property necessary to serve them.

"According to the evidence, experience shows that, where a fair return is not being made by the company in question, the percentage of customers carried at a loss is higher. This percentage even reaches 90 per cent. This result does not occur when a service charge can be included in the rate scheme, unless the meter rate was raised at the same time. If the meter rate remained the same, the sales were not affected by the inclusion of the service charge and the revenue per customer increased.

"The testimony also establishes that the reason for the falling off of demand upon an increase of the meter rate is the failure of the meter rate to meet the competition of other fuels, and that the rate of profit or return on customers using over 5,000 cubic feet of gas per month is very high when a straight meter rate is used, ranging from 50 to 100 per cent. on the property used, even when the business as a whole is yielding less than 8

per cent. When the rate is increased in an attempt to raise the return to 8 per cent., the bulk of this increase falls upon this same group of customers, who are already paying more than their share, and the result is that the rate of service is raised beyond the competitive limit, and the customers turn partially or entirely to some other fuel. It further appears that, when the service charge is installed, the bulk of the increase falls upon the large group of convenience customers, who are being served at a loss, and is small in proportion to the total bill of the large customers. It therefore does not affect sales to any great extent.

"It further appears from the testimony that there is one class of customers benefited by a straight meter rate. This class is composed of those convenience customers who have no use for gas except as a high speed convenience, and who as a group use only about 10 per cent. of the gas. On any straight meter rate, a large percentage of the customers is served at a loss, this loss being made up by other customers of the company. The attempt to collect this loss from the larger customers forces the price of gas beyond competitive cost of other fuels. The straight meter rate, therefore, results in the curtailment of service to the customers and high average rates. From the community standpoint it is not only discriminatory, in that one set of customers benefits at the expense of another, but it is subversive of the general welfare, by forcing the use of coal and other fuels, with their resulting smoke, dirt, and annoyance.

"It appears that there are several modifications of the meter rate: The minimum bill charge, under which the customer is charged a minimum amount, whether he uses any gas or not; the so-called block rate, in which the rate is graduated according to the amount used; and combinations of the straight meter rate, block rate, and minimum bill.

"The testimony clearly proves that, without the element of the service charge in the rate structure, the rates must be discriminatory as between the customers and do not bring a fair return to the gas company. The minimum bill simply forces an individual to use enough gas up to the amount of his bill. Those who use under the minimum amount pay for gas not used by them. If such customer uses gas up to the value of the minimum bill at the rate in force, he has received in gas everything he has paid for and it becomes in fact a meter rate. Under the minimum bill system, those who use no gas and those who used under the minimum pay something towards a service charge. The only difference between the meter rate, and that rate with a service charge, a minimum bill, or a block rate, is one of degree. Each is inequitable. Under each form there is a large percentage of consumers who do not pay for the service actually rendered them or for the service demanded, and another large percentage who do not pay the actual cost plus a fair return; also a small but large consuming percentage, to whom the cost is made excessively high.

"There is a certain cost to the gas company for maintaining the service to each of its customers. This cost is ascertainable, and can be easily distributed among all customers who demand service. The testimony shows that, in order to work out a more equitable rate, it is necessary to apportion part of the maintenance in proportion to the demand. The only question legally before the master is the reasonableness and consequently the constitutionality of prohibiting a service charge in a rate structure, and its relation to an equitable allocation of the cost of service. The manner of its apportionment is a question of rate making for the commission and not here for review.

"The problem before the court is whether or not a service charge, in whatever disguise it may appear, is a necessary part of a fair rate structure. It seems, from the testimony of all the witnesses sworn, that a rate structure without the element of a service charge must work inequality upon a large part of the consumers. It seems, also, that it deprives the gas company of the right to obtain from its customers the cost of the distributed commodity plus a fair return.

"This statement must be amplified somewhat by a review of conditions as disclosed and established by the testimony. The experience of the industry has produced five rate forms: The 'meter' rate, which is a specified quantity of gas for a specified sum of money, as, for example, $1.50 per 1,000 cubic feet of gas delivered. The meter rate, with a 'minimum bill' as a feature, as, for example, $1.50 per 1,000 cubic feet of gas delivered, and 50 cents per month charged against each consumer, to be paid whether the consumer takes any gas or not during that month. If the consumer takes gas, the minimum bill charge is credited against the amount taken. The meter rate with a 'service charge,' being the meter rate described with an arbitrarily fixed sum per month in addition thereto. The 'block rate,' being the meter rate divided for example as follows: $1.10 for the first 100 feet of gas delivered; 10 cents for each suc-

ceeding 100 feet of gas delivered during the month.

"As elsewhere set forth herein, there are certain costs necessarily and inescapably imposed upon the gas company the instant that a consumer's residence or place of business is connected with the mains of the gas company, and these costs continue without regard to whether the consumer ever takes any gas or not. This applies to every consumer without any regard whatever to the volume of gas taken, or the conditions under which it is taken, or the purpose for which it may be used. Up to the time of taking gas, all the consumers of a gas company are upon the same footing with respect to the cost which they each impose upon the gas company. This cost is comprehended at this point by the statement of the company's condition of 'readiness to serve' at that time. From this point on, however, each consumer differs in the cost that he imposes upon the company, due to the fact that there is a difference in the demand of all consumers, the demand differing in the volume of gas taken, in the time in which it is taken, and the speed at which it is taken. This difference in demand makes the cost to the company of serving different consumers differ according to each demand. It will be seen at a glance, therefore, that, while a service charge can be made, a universal service charge cannot be made, which will reimburse the company for the cost of those services rendered to each consumer by reason of his attachment to the company's main. It is quite impossible to make a fixed and arbitrary charge which will apply to all consumers when they assert their individual demands for service, because it will be seen at a glance that an arbitrary fixed service charge, being the same to each consumer, if large enough to reimburse the company for its readiness to serve, and something more, on account of the demand of each consumer, must fail of its purpose because the demand of consumers all over the United States differs very widely, and only injustice and a taking of property can result, in some instances the property of the company, in other instances the property of consumers. While the element of the service charge must, in my opinion, be included in any equitable rate, it must be divided so as, first, to reimburse the company for the services rendered to all consumers alike, and then applied to each consumer according to that consumer's particular and individual demand.

"It will also be clearly understood that the minimum bill, while it will reimburse the company partly for the cost to each consumer for a readiness to serve, and, of course, could be made high enough to reimburse the company completely, it is wholly lacking in equity, in that, when the consumer takes gas under the rate with a minimum charge, he has contributed nothing, and that, if he is among that class of consumers elsewhere described who, by reason of the volume of gas taken by them reimburse the company completely, plus a fair return, and in addition something more than a reasonable charge which goes to make up the deficit created by other consumers, that as to this class the minimum bill is simply an added injustice.

"The block rate, it is perfectly plain, is an effort on the part of the gas company to reimburse itself for the cost of readiness to serve to all consumers. There is no question whatever of equity in charging $1.10 for 100 feet of gas and 10 cents for another 100 feet of the same gas, but obviously a large part of the charge for the first 100 feet, if collected from every consumer on the company's lines, would tend somewhat to reimburse the company for that cost imposed upon it by all consumers. But it appears by the uncontradicted testimony in the case that a large percentage of the consumers of every gas company, at times during the year, take no gas at all, therefore, a service charge concealed in the first 100 feet of gas amounts to nothing as to them, while it is paid by every fellow consumer who does take gas during these times; also, a high charge for the first small unit of gas taken is utterly lacking in any feature of equality when considering the difference in demand of consumers.

"The remaining rate is the so-called 'three-part rate,' elsewhere fully described, and the master finds himself obliged to adopt the conclusion of the experts who have testified before him, that under this rate each consumer reimburses the gas company for the service which he receives, plus fair return, and no more; that no consumer imposes a burden upon another; that no consumer escapes the payment or discharge of his particular obligation to the gas company; and that the gas company receives from each consumer simple and complete reimbursement, plus a fair return, and receives in the aggregate from all of its consumers that, and no more.

"The witnesses seem to agree that if the rates are raised by authority except by the inclusion of a service charge in the rate structure, there is no appreciable increase in the revenue for the reason that there is always an increase in the number of deficit class con-

sumers, and a decrease in the number of consumers in the profitable class. The Public Service Commission claims that chapter 898 of the Laws of New York for 1923, is valid as a reasonable exercise of the police power of the state. It is true that the courts of the state of New York have spoken as follows:

"People ex rel. Village of South Glens Falls v. Public Service Commission, 225 N. Y. 216, 121 N. E. 777: 'Rate regulation is a matter of the police power of the state and the terms and conditions such as here in question contained in a franchise to a service corporation may be modified without impairing the obligations of a contract within the provisions of the Constitution.'

"The question here is not one of rate making, but of the prohibition of the use of a certain component part in the erection of a rate structure which it is claimed must be included to accomplish an equitable result. To forbid such inclusion as such would certainly not be within the reasonable limits of rate making, exercised under even the elastic scope of the police power of the state. It has been held distinctly by the Supreme Court of the United States in Atlantic Coast Line R. v. N. C. Corporation Commission, 206 U. S. at page 26, 27 S. Ct. 594, 51 L. Ed. 933, 11 Ann. Cas. 398, as follows: 'Let it be conceded that if a scheme of maximum rates was imposed by state authority, as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes whom the carrier was compelled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, that such legislation would be so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the Fourteenth Amendment.'

"The Court of Appeals of New York has defined the limits of the police power as follows: In Ives v. South Buffalo Railway, 201 N. Y. 301, 94 N. E. 442, 34 L. R. A. (N. S.) 162, Ann. Cas. 1912B, 156: 'In order to sustain legislation under the police power the courts must be able to see that its operation tends in some degree to prevent some offense or evil, or to preserve public health, morals, safety and welfare. If it discloses no such purpose, but is clearly calculated to invade the liberty and property of private citizens, it is plainly the duty of the courts to declare it invalid.' It should perhaps be remembered in defining the somewhat vague limits

of this elastic power, that it has been described as the 'power to pass unconstitutional laws.'

"The right to furnish gas to the public at a fair and equitable rate is certainly a property right of the defendant gas company, subject to reasonable regulation. It needs no citation of authorities to establish this proposition. Is there not a reciprocal right vested in the consumer to receive such service under like conditions, a like property right, and can such consumer invoke the present remedy for its individual benefit? It would seem that the existence of this property right, claimed for the claimant and intervener, was clearly established in International Railway v. Rann, 224 N. Y. 83, 120 N. E. 153. Both sides have quoted at length from this case. The court distinctly states in its opinion as follows:

" 'The words "property and rights of the city" may well be limited to property and rights in the nature of property. See, however, Barber A. P. Co. v. Field, 134 Mo. App. 663 [111 S. W. 907]. But the right of the inhabitants of the city of Buffalo to ride on the street railroad for a five-cent fare is a property right, a right enforceable in the courts, not depending upon another's courtesy or forbearance. By the use of a "convenient fiction" (People v. North River S. R. Co., 121 N. Y. 582, 622 [24 N. E. 834, 9 L. R. A. 33, 18 Am. St. Rep. 843]) it may be plausibly pressed that such rights are not the rights of the city of Buffalo; but, if we look at the substance of things, we must conclude that the common rights of the inhabitants of the city, secured through the agency of the city officials, are rights of the city, and that the resolutions of the council thus modifying the Milburn agreement through the same agency come peculiarly within the description of resolutions "disposing of rights of the city." '

"The Rann Case, perhaps, may be said to arise out of an express contract between the city and the railway company. The principle of law, referred to with approval in the opinion, seems clearly applicable to the case under consideration, and establishes that rights secured under such a franchise inure to the benefit of the inhabitants of the contracting municipality, and creates a property right arising in their favor from the contract or franchise existing between the company and the municipality itself.

"This point seems to be clearly set forth in Humphreys v. Central Kentucky Natural Gas Co., 190 Ky. 733, 229 S. W. 117, 21 A. L. R. 664. There the court says: 'When a

public service corporation, such as a gas company, obtains the privilege of occupying and using the streets for a particular public service that will be beneficial to the people of the city and there is no express contract between it and the city, defining its duties and obligations, the law will raise an implied and enforceable contract to take the place of the omitted express contract and impose on the company the obligation to render the service that was reasonably within the contemplation of the parties when the contract was made.'

"There is consequently authority for holding that the rights of the inhabitants of the city are superior to the rights of the city itself, and that the city, as agent for the people and steward of its privileges, may protect the property rights primarily vested in the people themselves. Surely under this holding an inhabitant of Niagara Falls may invoke a remedy for his own benefit, which might be invoked under the Rann Case by the city in his behalf.

"Moreover, it is a well-established principle, and set forth by numerous cases, that a franchise of a utility imposes upon the utility accepting the same a contractual duty and obligation to give reasonable service at reasonable nondiscriminatory rates, and it must follow that from these duties and obligations to the individuals there must arise rights in the nature of property rights in the individuals for whose benefit the franchise was given. On this point the United States Supreme Court, in Omnia Commercial Co. v. United States, 261 U. S. 502, at page 510, 43 S. Ct. 437, 438 (67 L. Ed. 773), says:

" 'The essence of every executory contract is the obligation which the law imposes upon the parties to perform it. "It (the contract) may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other." Dartmouth College v. Woodward, 4 Wheat. 629, 656 [4 L. Ed. 629].'

"It is further stated in said opinion on page 510 as follows: 'If, under any power, a contract or other property is taken for public use, the government is liable.' And in Hepburn v. Griswold, 8 Wall. 603, at page 624, 19 L. Ed. 513, the court says: 'A very large proportion of the property of civilized men exists in the form of contracts. * * * And it is beyond doubt that the holders of these contracts were and are as fully entitled to the protection of this constitutional provision as the holders of any other description of property.'

"Prior to the enactment of section 898 of the Laws of 1923, the Public Service Commission of the state of New York allowed service charges as part of the gas rate structure. The Court of Appeals in City of Rochester v. Rochester Gas & Electric Corporation, 233 N. Y. 39, 134 N. E. 828, held that such a charge was fair and not discriminatory. Judge Cardozo in his opinion (page 46 [134 N. E. 830]) says:

" 'We are told that the plaintiff, being a public service corporation, is bound to serve, and that, since it is bound to serve, it may not charge inactive accounts for maintaining facilities for service. The conclusion does not follow from the premise. The law imposes the duty to establish connections for the householder who demands them, but it does not impose the duty either to install or to maintain gratuitously. No one is under an obligation to permit connections to be made between his building and the mains. If he demands the facilities, with the added expense that follows, he thereby invites a service, and must be numbered among those for whom service is maintained. * * * If there is a right to require payment for installation, there must be a right to require payment for repairs. If there is a right to insist upon payment in a lump sum, there must be a right to distribute the payment in accordance with the monthly average of cost. Even if installation were at the cost of the company alone, this would not mean that a return upon the cost would cease to be a factor in the computation of the charge for service. The burden of maintaining the agencies of distribution is to be apportioned among the total body of patrons for whose benefit the agencies exist. No doubt it is to be apportioned fairly and reasonably. But if that requirement is satisfied, it is not a ground for complaint that each has been required to contribute his share of the expense. A service charge is not something in addition to the price that would otherwise be fair and reasonable. It enters into the price of the commodity, not as an element of addition, but as an item of deduction. * * *

" 'The service charge is imposed, not on some only, but on all, and on all at the same rate. Discrimination, if it exists, must inhere in remoter incidents or consequences. We start with the recognition of the truth that perfect equality in operation, as well as in form, is not to be attained by any scheme of rates. Classification is not forbidden, if founded upon reason, and not upon caprice or favor. There are those who think that a schedule which does not impose a service

charge is discriminatory, since it shifts upon some consumers the burden of carrying the others. Occasional hardships there will be with any plan. It is a question largely of degree. The argument against the charge seems to rest upon the assumption that unjust discrimination inheres in every rate that is not a flat or uniform rate for every foot of gas supplied. The scale of charges must not be graduated, it is said, so as to adapt the payment to the cost. But that has never been the rule of rate making for public service corporations. Varying charges are not prohibited always and everywhere, but only varying charges for like services in substantially similar circumstances or conditions.'

"It is claimed by the Public Service Commission that a fair and equitable rate can be constructed under subdivision 5 of section 65 and section 66, subdivision 14, of the Public Service Commission Law. Under this subdivision the elements of the quantity used, the time when used, the purpose for such use, the duration of the use and other reasonable consideration * * * except service charge, which is prohibited by subdivision 6, can be used in the rate structure.

"The engineers, statisticians, and executives connected with the various gas companies, sworn in this proceeding, seem to be practically unanimous in testifying that without a service charge no rate structure can be fair, either as between the consumers themselves or as between the consumer and the company. If the rates are graduated according to the quantity used, the time when used, the purpose for which used, or the duration of the use, there is still a very large percentage of the consumers who pay the gas company less than the cost of the service to them. From the testimony taken in this action it seems that the only way of making the small consumers and the irregular consumers pay their fair proportion of the cost of the service is to make a direct charge for the service as a part of the rate structure, whether this service be in the form of a so-called service charge, or demand charge, or both; that is, whether it be divided according to the demand of the consumers, or part of it be apportioned equally among the consumers, and the other part apportioned among the consumers according to their demand. It is claimed by the defendants public service commissioners that this has been held by the District Court of the Southern District of New York in the action entitled New York & Queens Gas Co. v. Prendergast, 1 F.(2d) 351. The referee in his report in that action says:

" 'It seems to me that it is entirely pos-

sible to reconcile the provisions of chapter 898 of the Laws of 1923 with the Constitution, by giving weight to the rule of construction set forth in the foregoing cases, and I therefore think the same should be held a constitutional exercise of the legislative right. This action was brought to test the constitutionality of chapters 898 and 899 of the Laws of 1923. Chapter 899 fixed the price and quality of the gas. Chapter 898 prohibited the service charge. The proofs showed that the gas company could not furnish the gas of the quality prescribed by statute at the minimum rate prescribed by statute without a service charge, at a profit. The court held that chapters 898 and 899 as to this particular gas company were confiscatory and void. The court in its opinion (page 373) says: "In arriving at a just determination of the questions involved, it is quite necessary to consider the relations of the two statutes to each other. Considering chapter 898, which has reference to a 'service charge,' the special master is of the opinion, in which the court concurs, that it is entirely within the discretion of the Legislature to prescribe the form of the rate for gas, provided the legislative provision for the form does not in effect inflict a confiscatory rate. As chapter 899, prescribing the flat $1 rate, must be considered in the instant case while considering chapter 898, it follows, from the facts proven in the present instance, that the legislative enactments are both violative of the constitutional rights of the plaintiff." '

"In the case at bar we have no statute fixing a minimum rate, but the testimony taken in the action shows that an increase in rate would cause a decrease in the net earnings of the gas company. In the case before us we are faced with an economic law, instead of a statutory one. The experts sworn at the trial clearly demonstrate that an increase in the rate will not result in increased earnings on the part of the gas company; that the result of such an increase will cause the customers to use other fuel and tend to decrease the net earnings of the gas company; that the result of enforcing chapter 898 of the Laws of 1923, the chapter prohibiting the service charge, results in depriving the defendant gas company of a fair return upon its investment, by loss of customers and consequent loss of consumption. Such prohibition further deprives the plaintiff and the intervener, Hamann, of the right to purchase gas at a fair price, because the present rate structure requires an excessive and therefore prohibitive rate as to them.

"In New York & Richmond Gas Co. v.

Prendergast (D. C.) 10 F.(2d) 167, it is held that chapters 898 and 899 of the Laws of 1923, prescribing maximum charges for gas at $1 and $1.20 per 1000 cubic feet, and prohibiting a service charge for installing meters, etc., are confiscatory and violative of the federal Constitution. The court in its opinion (page 207) says:

" 'This application is to confirm the report of the special master, who, after hearings and full consideration of the issues presented in this cause, in a carefully considered opinion, held that the plaintiff was entitled to judgment adjudging unconstitutional and void the provisions of chapters 898 and 899 of the Laws of 1923. * * * The claim of unconstitutionality as to both statutes is based upon the argument that, if the rate fixed by the statute were enforced and the service charge eliminated, it would result in a confiscation of plaintiff's property. * * * We have heretofore held [page 209] that this statute fixing the rate and the standard of gas are inseparable, and that they must be read together, and that to fix a standard which may not be used with safety is an arbitrary and unreasonable exercise of police power. Kings Co. Lighting Co. v. Prendergast [D. C.] 7 F.(2d) 192. * * * We adhere to that decision and its application to the facts disclosed by this record. Approving, as we do, with the above modifications, the valuations arrived at by the master, we likewise approve the recommendation of the master that the rate of return fixed by the statute here challenged, if applied to this plaintiff, would be confiscatory of its property. The enforcement of chapters 898 and 899 of the Laws of 1923, prohibiting a charge by the plaintiff for its gas above the respective amounts of $1.20 and $1, and forbidding a service charge, are each confiscatory, and as such are in violation of the provisions of the federal Constitution.'

"The contention of the Public Service Commission that the courts have no jurisdiction to prescribe the form of rate is mainly correct. In the case at bar the plaintiff and the defendant gas company do not ask that the courts prescribe the rate structure. The relief demanded is that the Public Service Commission be enjoined from disallowing a rate schedule which contains, in its structure, a service charge. The relief asked is that the statute prohibiting the service charge be declared unconstitutional, on the ground that without such charge no rate structure can be fixed which will bring a fair return to the gas company or which will be equitable as between consumers.

"It is my opinion that the testimony taken upon the hearing clearly establishes both that a rate structure from which a service charge is prohibited, as such, is inequitable as between consumers, and such a rate structure deprives defendant gas company from earning a fair return upon its invested capital and the broad opportunity to serve the public at a fair return. This privilege is secured to it by its corporate charter, a contract with the state itself. The enactment of such a statute is an arbitrary and unnecessary attempt to exercise police power. It impairs the contract between the state and the company and the right secured to the public by virtue of its provisions. I therefore recommend as follows:

"That it be adjudged and decreed in this proceeding that chapter 898 of the Laws of 1923 is illegal and void, because in contravention of article 1, section 10, subdivision 1, of the federal Constitution, which forbids a state to pass any law impairing the obligation of a contract, and the Fourteenth Amendment, which provides that no state shall deprive any person of life, liberty, or property without due process of law, in so far as it prohibits the defendant Niagara Falls Gas & Electric Light Company from charging or receiving for gas manufactured and sold in the city of Niagara Falls a sum sufficient to pay the costs thereof, with a reasonable return upon the investment, and in so far as it prohibits the plaintiff and intervener Hamann from purchasing gas from the defendant Niagara Falls Gas & Electric Light Company at a reasonable cost.

"Second. That it be adjudged and decreed that neither the plaintiff, nor the intervener Hamann, nor the defendant Niagara Falls Gas & Electric Light Company, has adequate remedy at law to redress the injury which will result from the enforcement of chapter 898 of the Laws of 1923, and that such injury will be irreparable by the Public Service Commission as against a proposed rate schedule filed by the defendant gas company.

"Third. That it be adjudged and decreed that the plaintiff, intervener Hamann, and the defendant Niagara Falls Gas & Electric Light Company be granted a permanent injunction, issued out of and under the seal of this honorable court, against the defendants commissioners of the Public Service Commission of the state of New York, and each of them, and each of their successors in office, their deputies and attorney and each of their successors, servants, and employees, and any and every person acting or purporting to act

under or by virtue of the authority of chapter 898 of the Laws of the state of New York of 1923, from in any way enforcing or attempting to enforce provisions of said law against the defendant Niagara Falls Gas & Electric Light Company.

"Fourth. That it be adjudged and decreed that the plaintiff intervener, the defendant the Niagara Falls Gas & Electric Light Company, and the defendant the city of Niagara Falls be granted a permanent injunction, issued out of and under the seal of this court, against the defendants the commissioners of the Public Service Commission of the state of New York, and each of them, and each of their successors in office, their deputies, and each of their successors, servants, and employees, and any and every person acting or purporting to act under or by virtue of the authority of the Public Service Commission Law of the state of New York, or chapter 898 of the Laws of the state of New York of 1923, from making, entering, or imposing any order or requirement that the defendant gas company be required to serve and supply gas and gas service under a rate form which requires the service of a specified or fixed volume of gas for a specified sum, or any other rate form or form of rate which does not equitably allocate (a) a part thereof, including an equitable part of a fair return, to each consumer, to compensate the defendant gas company for those services which are rendered alike to all consumers; (b) to compensate the defendant gas company for those costs, including an equitable part of a fair return, imposed by each consumer upon the company according to and by reason of his particular demand for service."

Parker & Parker, of Niagara Falls, N. Y. (Alan V. Parker, of Niagara Falls, N. Y., of counsel), for plaintiff.

Williams & Williams, of Buffalo, N. Y. (Harry D. Williams, of Buffalo, N. Y., of counsel), for defendant Niagara Falls Gas & Electric Light Co.

Charles G. Blakeslee, of Binghamton, N. Y. (Russel B. Burnside, of Albany, N. Y., of counsel), for defendant Public Service Commission of New York.

Geo. W. Knox, of Niagara Falls, N. Y., for defendant city of Niagara Falls, N. Y.

Dudley, Gray & Phelps, of Niagara Falls, N. Y., for intervener.

HAZEL, District Judge. The plaintiff, United States Light & Heat Corporation, is engaged in business at Niagara Falls, N. Y., producing storage batteries, a leaden structure which in the making requires fuel for melting the lead. For that purpose, it uses a large quantity of fuel oil as a substitute for gas, but, owing to the large expense of fuel oil, as compared with the cost of gas, it desires to secure the latter for fuel from the defendant Niagara Falls Gas & Electric Light Company, provided, however, that the gas fuel may be obtained at a reasonable rate and at the rate at which the gas company is willing to supply gas service, if permitted to do so by defendant the Public Service Commission of the state of New York. Although plaintiff does not use gas, it nevertheless asserts that the right to be served with gas at a fair rate is a property right, and failure to do so is practically a confiscation of its property without due process of law, and denial of the equal protection of the law.

The intervening plaintiff is a householder at Niagara Falls, N. Y., and a consumer of gas, and complains that the so-called flat rate is discriminatory against him. An injunction is asked to restrain the Public Service Commission from enforcing an order, requiring service of gas by the defendant gas company, which specifies a rate for a fixed quantity of gas, or any form of rate which does not fairly permit allocation of service cost rendered to all customers.

The defendant Niagara Falls Gas & Electric Company, in its answer, alleges that, under the established flat rate, it sustains a financial loss; that its costs and expenses are not paid; and that it is unable to make a fair return upon its investment, resulting in a violation of its contractual rights and confiscation of its property. The defendant city of Niagara Falls avers that the charge for gas in domestic and industrial use is excessive and violative of the contractual rights of its residents. The Public Service Commission, in its answer, denies the alleged invasion of rights, and, inter alia, that a service charge is necessary to profitable operation of the gas company.

When this action was begun, the defendant gas company, under order of the Public Service Commission, supplied gas to consumers of Niagara Falls at the rate of $2.30 per 1,000 cubic feet, or at the flat rate; but, being dissatisfied therewith, it filed a schedule of new rates, or a proposed rate, called a three-part rate, by which the rate charges were graded, and included a monthly service fee to each user to compensate for like service rendered to its consumers, regardless of the quantity of gas used by them, or the service extended, or whether any gas is taken

or not. The proposed rate was based on an allocation of the exact cost to the gas company arising from the demands of each consumer in addition to a fair return for the service rendered. It specifically included (1) a service fee covering office rent and expenses, meter installation and inspection, and repair service; (2) a demand charge covering expense of structural depreciation and operating expense of physical property; and (3) a gas charge for supplying gas plus cost of maintaining system. The commission disallowed the proposed rate on the ground that a service charge is forbidden by chapter 898 of the Laws of 1923 of this state, which includes section 65, subd. 6, reading as follows:

"*Service Charges Prohibited.* . Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed."

This provision, it is urged by plaintiffs, is unconstitutional under the Fourteenth Amendment to the Constitution of the United States, and failure to permit the proposed rate, or the three-part rate, results in taking both plaintiffs' and the gas company's property in violation of their rights. In argument, they say that the existing rate allowed by the commission is excessive, and is for the benefit of one class of consumers against another to their loss; that as to larger users, including plaintiff the United States Light & Heat Corporation, the difference in cost between the established rate and the rejected rate amounts to a very large sum; that the intervener is obliged to pay a rate beyond the value of the service rendered, and, in effect, is compelled to contribute to a deficit arising from failure of other consumers, using only a small amount of gas, or none, to proportionately meet the service expense.

There also is evidence that the gas company, at the flat rate of $2.30 per 1,000 cubic feet, does not earn its operating or overhead costs, has not paid the interest on its first mortgage bonds for several years, and no interest has been paid on the second and third mortgage bonds, and, indeed, that a deficit of upwards of $450,000 has accumulated. The defendant gas company also contends that since a large number of consumers use little or no gas, there is no reimbursement for its outlay as to them, and that equitable allocation of the costs of its service to its consumers is necessary.

[1, 2] The instant case is, perhaps, unique in that the action was begun by a prospective user of gas, who later was joined by a domestic consumer, but both, nevertheless, have a right to gas service at a reasonable charge, without discrimination in favor of one user as against another, since defendant gas company was organized to supply the public at Niagara Falls with gas at a reasonable charge. For this service, of course, it is entitled to a fair return upon its investment. People, etc., ex rel. Woodhaven Gas Light Co. v. James Deehan, as Street Com'r, etc., 153 N. Y. 528, 47 N. E. 787. The right of the gas company, as well as the right of its consumers, as a general proposition, is, I think, a property right which entitled the parties to equal protection and treatment—one to service at a reasonable rate, without advantage over others, and the other, the gas company, to a fair rate of compensation for its outlay, made necessary by its service to each consumer, as included in the proposed three-part rate, and a reasonable profit from its operations.

[3] Such property rights are held to spring from the contract investing private property to a public use, and that it then "ceases to be juris privati only." Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819. No essential difference is perceived between one who actually uses the gas, paying an inordinate rate, and one who in good faith desires to become a consumer but is estopped by an excessive exaction. In either case there is a deprivation of one's property right without just compensation. It is no answer to say that he was not obliged to buy the gas, since the gas company has contributed its property to the public interest. The right of recovery is not limited to the municipality or the town where the gas company is located, for manifestly the franchise was granted by the state for the benefit of the public, and one sustaining injury to his property right by the misuse of a franchise, or by exacting an unjust rate, has a right to redress without awaiting the action of another (International Ry. Co. v. Rann, 224 N. Y. 88, 120 N. E. 153), except that the user, or one deprived of use, including, of course, the gas company, must abide regulations lawfully enacted by the state for the conduct and supervision of the business of supplying gas, and covering the authorized rates or charges, unless the enactment is confiscatory of the property either of him who serves, or the person entitled to service. Stone v. Trust Co., 116 U. S. 307, 6 S. Ct. 334, 388, 1191, 29 L. Ed. 636; Northern Pac. Ry. Co. v. N. Dakota, 238 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, Ann. Cas. 1916A, 1. The

question therefore is whether the Legislature has enacted a rate which operates as an encroachment upon the constitutional rights of the plaintiff consumers and of the defendant gas company, which, by its answer, joins with plaintiffs in asking for an injunction against the Public Service Commission, and also against the city of Niagara Falls to restrain interference with it in making a charge and collecting reasonable rates from the consumers.

[4] The special master has found that the present rate—a rate excluding a service charge—or indeed any rate, which may be established under chapter 898 of the Laws of 1923 of this state, denies to the plaintiffs the right of purchasing gas at a reasonable price, and to the defendant gas company the right to earn a reasonable rate and cost for its service to each consumer; that it is practically compelled to operate its plant at a yearly loss and without enabling it to obtain a fair return on its investment. This finding is substantiated by the evidence.

The proofs are that defendant gas company began supplying gas at Niagara Falls in the year 1900, has never been able to pay a dividend to its stockholders or interest on its bonded indebtedness, and in 1923 notified the Public Service Commission that it intended to discontinue service; but the commission prohibited such action, and on February 15, 1924, a schedule of rates was filed covering a three-part rate, including a service charge to each consumer, but the commission ruled that the proposed rate, including a service charge, was forbidden by the laws of the state. The testimony of a large number of witnesses was taken in various cities and in different states, but no useful purpose would be served by referring to it in detail. For the most part, it showed a variation of demand of different classes of consumers, and the various experts testified that, in their opinion, each consumer should be required to contribute towards reimbursing the gas company for costs and expenses necessary in serving him, or, on installation of meters, holding itself in readiness to do so; that the flat meter rate (except in one or two instances) is not a reimbursement of costs and affords no fair return on the investment, while the three-part rate accomplishes this purpose and is derived, in the aggregate, from all the consumers or subscribers regardless of whether any gas is actually used or not. Of course, no one is compelled to use gas or retain meters in the anticipation of its use, but when apparatus is installed and connections made it is meet that there be a contribution to the cost of its maintenance.

It is strongly urged by counsel for the Public Service Commission that plaintiffs' remedy under the statute was to complain to the commission, which has power to give relief to consumers and subscribers on their petition, joined with 25 other users, or on the petition of the gas company, as provided by sections 71, 72, of the Public Service Commission Law, which, in short, confers the right of investigation followed by hearing and establishing of just and reasonable rates; and further that relief is afforded under section 65, subd. 5, which reads as follows:

"5. Nothing in this chapter shall be taken to prohibit a gas corporation or electrical corporation from establishing classifications of service based upon the quantity used, the time when used, the purpose for which used, the duration of use or upon any other reasonable consideration, and providing schedules of just and reasonable graduated rates applicable thereto. No such classification, schedule, rate or charge shall be lawful unless it shall be filed with and approved by the commission, and every such classification, rate or charge shall be subject to change, alteration and modification by the commission."

The affidavit of Mr. Rude, member of the bar and deputy commissioner of the legislative bill drafting commission of this state, was received in evidence by stipulation of the parties, and, in his opinion, subdivision 5 of section 65 was not repealed by the later enactment of chapter 898 adding subdivision 6 to such section, either directly or by implication, and that they are not inconsistent with each other.

[5-7] To repeal a statute by implication, the legislative intent to do so must be clearly apparent, and, upon reading both subdivisions, I agree that no inconsistency is apparent. Even though subdivision 5 covers certain obtainable relief by the gas company, it is plainly limited, in my opinion, to classifications as to the use of gas and fixing graduated rates. It permits consideration of other reasonable conditions, but subdivision 6 is a bar to making an additional charge in the way of a service charge, for example, the installation of a meter, or its use. In view of the denial by the commission, on application of defendant gas company, to make a service charge, it would have been idle for plaintiff, or intervener, to complain or to associate other consumers with them in order to file a complaint under sections 71, 72.

In New York & Queens Gas Co. v. Pren-

dergast (D. C.) 1 F.(2d) 351, it was ruled that a service charge, under subdivision 6, was not void because of inability to reconcile it with either provisions of chapter 898 of the Laws of 1923, but that, in fixing the form of rates for gas companies, it nevertheless is essential that the determined rate be not confiscatory, and since, in that case, a flat rate was prescribed under chapter 899, it was necessary to resort to the evidence which showed that plaintiff could not make a profit under such rate without a service charge, and accordingly the material enactments were held to be in violation of its constitutional rights.

In this case, it is true, the question of a statutory minimum rate is not involved; but I am satisfied by the evidence that a mere increase of the present rate would not be helpful to the defendant gas company, as, in all probability, a large percentage of its consumers and subscribers would resent an increase as excessive, and users would resort to other fuel substitutes. In New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F. (2d) 167, the District Court composed of Manton, Circuit Judge, and Campbell and Inch, District Judges, likewise ruled that chapters 898 and 899, prescribing a minimum charge for gas at $1 and $1.20 per thousand cubic feet and prohibiting a service charge for installment and use of apparatus, was confiscatory and in violation of the federal Constitution.

Although in these cases the bases for the conclusion reached were on somewhat different facts, or rate regulations, there is, nevertheless, analogy in principle in the instant case. As aptly said by the special master: "In the case before us, we are faced with an economic law instead of a statutory one," and after pointing out, rightly, I think, that even after graduating the rates as to quantity, time when used, purpose, etc., there would still be many consumers who paid the gas company less than the cost of serving them. This would result from the fact that small users or nonusers of gas, though having meters and connections, would not be fairly contributing to the cost, hence necessitating a greater contribution from large users.

Counsel for the Public Service Commission contends that the evidence discloses that certain gas companies, located in different parts of this state, may be operated, and indeed are operated, successfully under a system of classification and grading of rates; but the weight of the evidence before me persuasively shows that conditions here are different, and that, without a service charge to consumers, there is unfairness, in its dealing, to a class of consumers using larger quantities of its gas than others.

According to the proofs, and the opinion of the special master, a three-part rate would be a practical application in the operation of the gas company's business, and numerous witnesses (including two former members of the Public Service Commission), engineers and skilled officials of other gas companies, expressed the opinion that a statute which prohibits a service charge—or a rate based on a service charge, a demand charge, and a commodity charge, which would result in a proportional division of the cost among the consumers—would result in inequality and unfairness between the consumers and the gas company.

[8, 9] It is fully appreciated that the solemn enactment of the Legislature, regulating gas companies and authorizing the Public Service Commission to establish rates, should not be lightly nullified, and only in a clear case will its action be held unconstitutional by the courts; but when it is proven that the adopted rates destroy guaranteed rights and result in taking property without due process of law, the court, before whom the action comes, cannot shirk its responsibility. In such a case, as said in San Diego Land Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154, it must meet the issue, taking care, however, not to encroach upon a lawmaking power. Here, as already stated, the evidence in its entirety warrants holding that in prohibiting the so-called service charge to consumers of gas at Niagara Falls, the gas company is estopped from allocating the cost of production to the consumers in equal proportions, and, moreover, is prevented from earning a reasonable profit upon its invested capital. The enforcement of the particular statute in controversy (subdivision 6 of section 65) must therefore be held to be confiscatory and in violation of the constitutional rights of both plaintiffs and of the defendant Niagara Falls Gas & Electric Light Company.

The report of the special master has fully and comprehensively passed upon the various questions involved, and he has given careful consideration thereto. In his opinion, submitted with his findings (to which reference may be had for more extended details), he recommends that it be decreed that the statute in question, as applied to both plaintiffs and to the defendant gas company, is arbitrary and an impairment of contractual rights. My examination of the record leads to confirmation of the conclusions reached by him.

The defendant Public Service Commission has filed 41 exceptions to the special master's report, but, for reasons stated, they must be overruled. A decree may be entered confirming the master's report and granting the injunction relief prayed for. The suggestion advanced, at the opening of the hearing, by counsel for the Public Service Commission, that a statutory court of three judges was required to pass upon the question of granting a permanent injunction, has been voluntarily withdrawn, there having been no application for a preliminary injunction. See Smith v. Wilson, 273 U. S. 388, 47 S. Ct. 385, 71 L. Ed. 699; Moore v. Fidelity & Deposit Co., 272 U. S. 317, 47 S. Ct. 105, 71 L. Ed. 273.

[10] Decree may be settled on notice; it to restrain the Public Service Commission of this state from enforcing a rate which does not fairly allocate a part of the service cost to each consumer, so as to include an equitable return in compensation to the gas company for like services to each consumer, and also to reimburse the gas company for its costs and expenses, based upon the consumer's demand for service.